Edna E. CULL, Respondent,

v.

George H. PFEIFER, Loretta P. Pfeifer, Harry R. Pfeifer, and Elizabeth C. Pfeifer, Appellants.

No. 45659.

Supreme Court of Missouri, Division No. 1.

Dec. 9, 1957.

Albert E. Hausman, Melville A. Ochsner, Morris A. Shenker, Owen G. Jackson, Maurice S. Karner, St. Louis, for appellants.

Kappel & Neill, Walter S. Berkman, St. Louis, for respondent.

COIL, Commissioner.

Plaintiff, Mrs. Edna Cull, instituted this equity suit to cancel certain deeds and for other relief. She is the daughter of defendant, Elizabeth C. Pfeifer. Defendant, George H. Pfeifer, is plaintiff's brother and the son of defendant Elizabeth. Harry R. Pfeifer, Jr., is plaintiff's nephew and the grandson of defendant Elizabeth, and defendant, Loretta P. Pfeifer, is Harry's wife.

Plaintiff averred that her mother was 89, feeble, infirm, nearly blind, unable to read, and incapable of managing her affairs; that she was in the custody of and under the domination and control of defendants George, Harry, and Loretta; that they had

managed and controlled Elizabeth's property for their benefit and had conspired to deprive her of her property; that on December 6, 1953, and on December 30, 1953, Elizabeth executed three deeds as the result of the undue influence exercised by George, Harry, and Loretta at a time when Elizabeth was unable to manage her affairs and unable to comprehend the meaning of the transactions involved; that said defendants also had deprived Elizabeth of large sums of money and had used it for their benefit; that plaintiff believed that unless relief was granted, George, Harry, and Loretta would convey the real estate and dissipate Elizabeth's other property; that the suit was instituted primarily for the benefit and protection of the person and property of Elizabeth and, secondarily, for the benefit of plaintiff and other heirs who had a possible inheritable interest in Elizabeth's property. Plaintiff prayed, inter alia, that the deeds be cancelled, that defendants other than Elizabeth account for and return and restore all of Elizabeth's property so obtained, and for general relief.

Motions on behalf of defendants, including Elizabeth, seeking dismissal of the action on the ground that plaintiff had no sufficient interest to maintain it, were overruled. Answers were filed in which defendants, including Elizabeth, generally denied plaintiff's averments and defendants, other than Elizabeth, affirmatively alleged that plaintiff had coerced Elizabeth into making a will and that Elizabeth executed and delivered the deeds in question to correct the provisions of that will and that the present suit was not brought in good faith to protect Elizabeth and her property but was brought to put the coerced will into force and effect.

The trial court cancelled the deeds, decreed title to the real estate in Elizabeth, directed defendants George, Harry, and Loretta to reconvey to Elizabeth, directed George, Harry, and Loretta to account for certain of Elizabeth's money which they had expended to buy automobiles, to repay any sum so established, and, upon failure

to so do, that a judgment for that amount be entered. The trial court retained jurisdiction until compliance with the terms of the judgment.

■ At the outset we are met with defendants' contention that plaintiff could not properly maintain this action because she had no sufficient interest in its subject matter, and that the court therefore erred in overruling defendants' motions to dismiss.

■ There was no averment in plaintiff's bill either that plaintiff had any interest in the subject matter of the suit other than a possible inheritable interest, or that any proceeding had been instituted or consummated pertaining to a guardianship for Elizabeth. It is apparent, therefore, and there is no contention to the contrary, that plaintiff, in her individual capacity and as the daughter of Elizabeth, had only a possible prospective interest in the property forming the subject matter of the suit; i. e., the possibility of a right to inherit. There can be no doubt about the proposition that a mere possibility that one may inherit does not give that one a sufficient interest in the property of the ancestor to maintain during the ancestor's lifetime an action to cancel his deed transferring his property. Dafoe v. Dafoe, 160 Neb. 145, 151, 69 N.W.2d 700, 704 [5]; Craig v. Craig, 264 Pa. 380, 382, 107 A. 719, 720; Hribernik v. Reorganized School Dist. R–3, Mo.App., 276 S.W.2d 596, 598 [4–5]; Garrison v. Schmicke, 354 Mo. 1185, 1187 [1], 193 S.W.2d 614, 615 [3–5]; 12 C.J.S. Cancellation of Instruments § 45, p. 1015.

Plaintiff asserts her right to maintain the suit on behalf of her mother because of her averments that her mother, with her physical ailments and infirmities, who, in the physical custody and control of, and under the domination of, the other defendants, was unable to take effective action to protect and preserve her estate and, says plaintiff, under those circumstances, she, as the daughter, could properly bring an action on her mother's behalf to protect her estate. It should be noted at this point

that plaintiff did not bring this action as a next friend nor did the trial court appoint a guardian ad litem to bring or defend such action on Elizabeth's behalf.

Plaintiff relies on Tracy v. Sluggett, 360 Mo. 1120, 232 S.W.2d 926, 930, to sustain her right to maintain the instant action. Defendants urge the total inapplicability of that case. In Tracy v. Sluggett, supra, a fourth cousin of Mrs. Delaney brought an equity action to cancel a trust indenture which Mrs. Delaney had theretofore executed. The petition alleged that Mrs. Delaney, who was joined as a party defendant, was of unsound mind. Walter L. Roos, who had been appointed a guardian for the person and curator of the estate of Mrs. Delaney, was granted leave to intervene. The petition further alleged that the St. Louis probate court had adjudged Mrs. Delaney of unsound mind, had appointed Mr. Roos guardian, that on appeal to the circuit court a jury had found her to be of unsound mind, that one of the defendants purporting to act for Mrs. Delaney had filed a motion for new trial and intended to perfect an appeal from any ensuing adverse judgment. It was further alleged that the trust instrument was void because of the mental incapacity of Mrs. Delaney and by reason of undue influence and duress exercised upon her by named defendants; that plaintiffs had reasonable cause to believe that the real estate involved would be conveyed and Mrs. Delaney's propery dissipated; that the suit was instituted primarily for the benefit of Mrs. Delaney and secondarily for the benefit of the heirs who had a contingent inheritable interest. Intervenor, Roos, prayed that the trust instrument be held void and that he be declared the duly-appointed guardian exclusively in charge of the person and property of Mrs. Delaney under the supervision of the probate court.

This court sustained the jurisdiction of the circuit court and the right of the fourth cousin to maintain the suit. The opinion in Tracy recognized the heretofore-noted rule that one whose only interest is that of a possible heir may not maintain a suit to cancel a conveyance by his ancestor during the ancestor's lifetime. The circuit court's jurisdiction was sustained on the ground that a court of equity had the power to and would act to preserve the estate of an insane person even though proceedings for the protection of the person and estate of such person were then pending in the probate court, when it appeared that that court could not act in time to make its action effective. And this court held also that the action brought by the fourth cousin was "tantamount to the commencement of an action by next friend" and that for the sole purposes of promoting the welfare of Mrs. Delaney and the preserving of her estate the fourth cousin was a proper party to maintain the suit.

Defendants point out that the Tracy case dealt with one alleged to be and proved to be of unsound mind, and for whom a guardian had theretofore been appointed, whereas in the instant case it was not alleged or proved that grantor was of unsound mind or that any guardian had been appointed or any action instituted for that purpose. (In the first instance, plaintiff's right to maintain instant suit must be determined by the allegations of the bill. Of course, if an averment of the bill in a particular, essential to the right of plaintiff to maintain the suit, was not sustained by the proof, the court would dismiss the action.) The scope and effect of our holding in Tracy should, perhaps, be limited in some respects as applicable only to the exact facts of that case. But in so far as concerns the preservation of the person and estate of one who is helpless to effectively act for himself, the same principle that actuated the court in reaching the result in Tracy of necessity applies with equal force to other similar but different factual situations, such as the situation alleged to have existed in the instant case. And in the instant case, unlike Tracy, no obstacle to the circuit court's jurisdiction existed by reason of the pendency of a guardianship proceeding.

**▪**Furthermore, it appears that an action may be maintained by a next friend or guardian ad litem on behalf of one who, because of weakness of mind short of insanity, is incapable of suing for himself. 44 C.J.S. Insane Persons § 134, p. 292. And an insane person may sue by a next friend or guardian ad litem prior to the appointment of a guardian. Kleber v. Carlos, Mo., 202 S.W.2d 865, 866 [24]. It would appear that the same considerations resulting in the foregoing call for the same result where the inability to protect one's interests by or in litigation is due to causes other than mental infirmity. "It is not necessary that one be non compos mentis or insane to be represented by a next friend. It is enough that he is, 'by reason of mental or bodily infirmity, incapable of properly caring for his own interests in the litigation.'" McGinnis v. McGinnis, Tex.Civ.App., 267 S.W. 2d 432, 435 [6].

We have reached the conclusion, therefore, that where, as in the instant case, a daughter has made the averments we have heretofore set forth, she should be considered as having instituted the suit as the next friend (Tracy v. Sluggett, supra, 232 S.W.2d 930) or guardian ad litem of her mother, and that so considered she could properly institute and prosecute the instant suit. Whether she may successfully obtain thereby equitable relief depends, in the first instance, on whether the evidence sustains the averments which we have held entitled plaintiff to sue as her mother's next friend or guardian ad litem. In other words, there is, in the present case, not only the issue as to whether the deeds in question were obtained by undue influence, coercion, and duress, but there is also the preliminary question as to whether the proof sustains plaintiff's right to maintain the action on behalf of her mother, and, especially so, where, as here, the mother by a pleading filed by an attorney has controverted the right of her daughter to maintain the suit on the mother's behalf.

It would appear that decisive of the latter issue is whether the mother, Elizabeth C.

Pfeifer, in her aged and infirm condition was so controlled and dominated by named defendants that she did not and could not, under the circumstances, appreciate and understand the nature and purpose of the suit and, if so, decide for herself and make effective that decision, whether to bring and prosecute such a suit. Dafoe v. Dafoe, supra.

The two issues in the instant case, while separate, are nevertheless overlapping and, consequently, we shall review the evidence as it affects the question of plaintiff's right to maintain the action as well as it affects the other questions, including that as to the validity of the deeds.

**▪▪** On this appeal we weigh the evidence and arrive at our own conclusions as to its weight, taking into account the trial chancellor's position to judge the credibility and characteristics of the witnesses who testified before him. The burden was and is on plaintiff to prove by convincing evidence her right to maintain the suit, the invalidity of the deeds, and the right to other relief. Peine v. Sater, Mo., 289 S.W. 2d 101, 102 [1–3].

There are a number of significant dates and events disclosed by the record. In the main, the facts that certain events occurred on certain dates are not disputed. The controversy centers around the circumstances under which those events occurred. Consequently, it may afford a clearer picture, after some background, to set forth the events in chronological order together with some undisputed facts concerning them, and thereafter to set forth the parties' conflicting versions of those circumstances.

In 1912 Henry Pfeifer, late husband of defendant, Elizabeth, began to operate as the Energetic Roofing Company with an office in the basement of his home on Lee Avenue in St. Louis. Later, offices were erected on the adjoining lot. Harry, Henry's son, went into the business with his father and continued until the son's accidental death in 1943. Harry left two

children, defendant Harry, Jr., and Mrs. Elizabeth Heim. In about 1928 Henry and Elizabeth and their son, defendant George, moved to the home on Bellefontaine Road, where the three resided continuously until Henry's death, and Elizabeth and George thereafter. Plaintiff, Edna Cull, and her family had for 37 years resided in the upstairs part of the family flat on Lee Avenue.

Henry was adjudged of unsound mind in February 1952, and his son, present defendant George, was appointed successor guardian. Henry died in March of 1953 at the age of 91, and in April 1953 Elizabeth, 89 at trial time, as Henry's widow, received (as a result of the guardian's settlement to date of ward's death) $19,171.16 in cash, and goods and chattels valued at $309.85. Elizabeth and Henry had owned in an estate by the entirety three parcels of real estate, of which Elizabeth was sole owner at the times of the execution of the deeds hereinafter described. The cash, in various banks, was immediately transferred to joint accounts in the names of Elizabeth and her son George. The real estate consisted of a two-family flat on a lot about 31 x 210, herein called the Lee Avenue property, 148 acres on Bellefontaine Road in St. Louis County, herein called the farm, and 20 acres across the road from the 148 acres on which was a house, herein called the home.

In April (all days and months hereinafter mentioned will be in 1953 unless otherwise indicated), Elizabeth executed a will, prepared by lawyer Oetting and sometimes herein referred to as the Oetting will. By it, Elizabeth left nothing to Harry Pfeifer, Jr., her grandson, or to Elizabeth Heim, her granddaughter, and failed to mention either therein. (That will was an exhibit but has not been deposited here, but we glean that it provided that the Lee Avenue property go to Edna, the home to George, and the farm in equal parts to Edna and George.)

On December 3, Elizabeth executed a will, witnessed by her son George and one Nicholas Mike, which had been drawn by defendant Harry, Jr. (after some general instructions by a lawyer), and by the terms of which the Lee Avenue property went to Edna, the home place to George, and the farm to George and Loretta (Harry, Jr.'s wife) in equal parts. That will is hereafter sometimes referred to as the December 3 will.

On December 6, Elizabeth executed a deed conveying the farm to George and Loretta, bearing an acknowledgment taken by Nicholas Mike.

On December 16, Elizabeth executed a contract by the terms of which she retained and agreed to pay a reasonable fee for the services of John C. Kappel, a lawyer who represents plaintiff in the instant suit.

On December 18, Elizabeth, through lawyer Kappel, instituted a suit to cancel the December 6 deed conveying the farm to George and Loretta. (That suit was later amended to include the December 30 deeds hereinafter described.)

On December 19, Elizabeth executed a will drawn by lawyer Kappel, witnessed by Mr. Christy George and Mrs. Pearl Mandle, by the terms of which the Lee Avenue property went to Edna, the home to George, and the farm to Edna and George in equal parts. That will further specifically provided that Harry, Jr. and Elizabeth Heim, testator's grandchildren, were to receive nothing.

On December 26, Elizabeth signed an instrument, acknowledged before notary Mike, directing Mr. Kappel and his associates, Berkman and Neill, to forthwith dismiss the suit instituted on December 18.

On December 29, the deposition of Elizabeth, plaintiff in the December 18 suit, was scheduled at Elizabeth's home.

On December 30, Elizabeth executed two deeds, one conveying the home place to George and the other conveying the rear 110 feet of the Lee Avenue property to George and Loretta. Elizabeth also signed on that date a letter directed to Mr. Kappel requesting the return of all documents in his possession which related to her affairs.

Mr. Kappel and his associate, Mr. Berkman, apparently refused to dismiss the December 18 suit or to withdraw therefrom without an order of court, after hearing, specifically authorizing Elizabeth to dismiss, and apparently another attorney representing Elizabeth filed a motion to dismiss the December 18 suit. In any event, on February 4, 1954, a hearing before the same trial judge who heard the instant case and at which hearing Elizabeth appeared and testified, resulted in the dismissal of the case filed December 18 without prejudice.

There was medical evidence that Elizabeth was unable to appear at the instant trial because she had influenza. Her testimony given at the February 4, 1954, hearing was read in evidence by her instant counsel. Further reference will be made to that hearing and to Elizabeth's testimony.

There is general agreement among all concerned that Elizabeth Pfeifer, who, as noted, was 89 at trial time, during and in the months immediately preceding December, 1953, spent much time in bed and was waited upon by a housekeeper and her son George. Her eyesight was defective and, generally speaking, she could not see to read or write. She could sign her name only with the physical assistance of someone to place her hand upon the signature line. It also appears, however, that prior to and during December, 1953, Mrs. Pfeifer knew the nature and extent of her property and the natural objects of her bounty; in short, possessed sufficient mental capacity to execute a valid will.

Furthermore, there can be no doubt of the fact that George, 67 years old, a bachelor, who had lived at the home and was otherwise unemployed for the 27 years preceding trial, handled completely all business transactions for and on behalf of his mother and that she reposed in him the utmost trust and confidence.

Mrs. Gerardi, housekeeper for the Pfeifers from July 31, 1952, until September 19, 1953, testified that Mr. Oetting (one of the attorneys representing George as the guardian of his father's estate) asked the witness to remain in the room while Elizabeth's proposed will was discussed; that Elizabeth, who was then confined to her bed, told Oetting that she did not want Harry to have anything because he had been given the business "which was his share"; that about a week later Oetting returned with a will and went into the room where Elizabeth and George were present. She testified further that although Elizabeth wished to leave the home to visit her daughter and for other purposes, George would not permit her to go anyplace other than to Harry's home, on which visits she was accompanied by George; that in March or April, when Elizabeth, George, and Harry were together, Harry suggested a meeting so that Elizabeth could give them what she wanted them to have and suggested that if she did not treat him (Harry) right there would be trouble; that Elizabeth replied that all the property was hers and that she was not going to give any of it away; that immediately thereafter Harry and wife, Loretta, visited with George and Elizabeth on several evenings and that Elizabeth said, upon returning from a visit at Harry's home, that Harry and Loretta would always express to her the hope that she would treat them right; that George claimed that Harry wanted all the Lee Avenue property so that he could remove the flat and make a parking lot; that George during the period from March to September would say to his mother almost every week that Harry wanted to know when she was going to give away her property and Elizabeth said that Harry asked her that every time she visited him; that when George would leave the house he would admonish the witness to watch his mother to see that she didn't sign anything; that Mrs. Pfeifer was mentally alert and capable of disposing of her property. Mrs. Gerardi, who had known the Pfeifer family for years, appeared to have had no interest in the litigation but she had visited plaintiff since leaving the Pfeifer home.

Christy F. George was a real estate salesman with Edward L. Kuhs Realty Company

who had been attempting to find some property for plaintiff. Plaintiff told him that there was a possibility that her mother might permit him to list the farm for sale. (According to plaintiff, George wanted to sell the farm through some salesman who would be a stranger to Harry.) He went to the home in October, 1953, to discuss the matter, and obtained a listing contract dated November 3, 1953, and signed by Elizabeth and George, authorizing the sale of the farm for $150,000. Some time in early December, George Pfeifer arranged for the presence of the witness in the Pfeifer home and there, in the presence of his mother, George Pfeifer related that Harry and his wife and Mr. Mike had visited Elizabeth and that she had "deeded the property" to Harry and Loretta for $10; that someone had put a pen in Elizabeth's hand and said "sign." Elizabeth said she had to sign and George said he could not do anything because Harry was big and strong and could break him "in two." Christy George advised them to call their lawyer and when they indicated they had none, suggested that he would call one of the lawyers who did work for the Kuhs Company. Both were anxious that he do so because they did not want Harry and Loretta to have the farm. (Mrs. Cull corroborated Christy George's account of that visit which she said was on December 15.) Mr. George called Kappel and, as a result, Kappel, Mr. Berkman, Kappel's associate, and Christy George went to the Pfeifer home. There were present Elizabeth, George, and Mrs. Cull, the plaintiff. The two lawyers, Christy George, and Mrs. Cull testified concerning that meeting. We shall attempt to set forth a composite of those accounts.

George and his mother agreed that on two recent occasions Harry and his wife and a notary had come to the house and on each occasion had put a paper before Mrs. Pfeifer and told her to sign it; that she had to sign, that George couldn't stop it, that Mrs. Pfeifer did not know what she was signing, did not wish to then sign a will or a deed divesting herself of property

and that she wanted back any property she had conveyed and wanted a new will and wished Kappel and Berkman to proceed at once to set aside any deed and get back the property. George was also most anxious for them to get back the property for his mother and understood he would be a defendant in a suit for that purpose.

Mr. Berkman then proceeded to Clayton where he found the deed of December 6 which had been recorded on December 7. As noted, he immediately prepared and filed a suit to cancel that deed. Mr. Kappel remained at the Pfeifer home and discussed the new will which Mrs. Pfeifer wanted. In that relation, she said she wanted the home place to go to George and the Lee Avenue property to Edna. Kappel advised that an equitable division of the farm would be one third to Edna, one third to George, and one third to Harry, Jr., and Elizabeth Heim in equal parts. George said Harry had received enough and should receive nothing more. Mrs. Pfeifer then directed that the will provide: the Lee Avenue property to Mrs. Cull, the home place to George, and the farm to George and Mrs. Cull in equal parts. Mrs. Pfeifer then signed the heretofore-mentioned contract by which she hired Kappel as her attorney.

Mr. Kappel returned to the Pfeifer home on December 19 for the purpose of having executed the will he had drawn in accordance with Mrs. Pfeifer's instructions. He had asked Christy George to appear and bring another to act as witnesses. Christy George appeared but without another. George Pfeifer volunteered to get (and did get) a neighbor, Mrs. Pearl Mandle, to act as a witness. Mr. Kappel asked George Pfeifer and Mrs. Cull to leave the room, then, after distributing copies thereof and mentioning that reading a will in the presence of prospective witnesses was unusual, proceeded to read the will a paragraph at a time, explained each paragraph, obtained Mrs. Pfeifer's statement that she understood the purport of each paragraph and thereafter she signed the will which was

witnessed by Christy George, Mrs. Mandle, and apparently also by Mr. Kappel.

Christy George, Mrs. Mandle, and Edna Cull corroborated the aforedescribed circumstances under which the December 19 will was executed. Mrs. Mandle was a neighbor who had known Mrs. Elizabeth Pfeifer and George for many years. She said that at the time of the signing Elizabeth said that Harry had received all that was coming to him.

Returning now to the circumstances leading up to the signing of the December 3 will and the December 6 deed. Mrs. Cull testified that from the date of her father's death until January 1, 1954, she visited her mother each day plaintiff was in the city. (Plaintiff said she last saw her mother April 1, 1954, and had been unsuccessful in repeated efforts to see her since.) In late November 1953, plaintiff made an emergency trip to Des Moines, Iowa, due to her married daughter's illness. Plaintiff specifically told her mother and George of the trip. She returned on December 3 and visited her mother, finding her "half sick." On December 4, George asked his mother to tell plaintiff what had happened the night before and George then told of Harry and Loretta and Mr. and Mrs. Mike appearing with a will which Harry had drawn in accordance with his wishes and which he wanted Mrs. Pfeifer to sign. She did sign it and George signed as a witness, he said to protect his mother. Mrs. Pfeifer told plaintiff she did not understand it and didn't know what she was signing. And the next day George said that Harry had found out that Mrs. Pfeifer had theretofore made a will (the Oetting will) excluding him and, for that reason, had a will prepared the way he (Harry) wanted it. George reiterated that Harry and Loretta had forced Mrs. Pfeifer to sign.

Mrs. Cull again visited the home on December 7, and George vehemently insisted something must be done to prevent Harry and Loretta from proceeding. George then told what had happened the evening before.

With reference to the December 6 deed which has been related heretofore, Mrs. Pfeifer said, *"Edna, I don't understand what this is all about. I thought George wanted me to sign."* (Our italics.) George continued to curse and threaten Harry.

Mrs. Cull also told of asking George's permission to take her mother home with her. George refused. He also said Harry and Loretta had the day before discussed as their next move having Mrs. Pfeifer declared of unsound mind. Again on December 24 and on Christmas Day George refused to let his mother go to her daughter's home. On December 26 George, after receiving a phone call, said to Mrs. Cull that she should obtain a deed to the Lee Avenue property while her mother was alive or Harry would take it away from her. And again on December 28 George told her to act quickly and get a deed to the Lee Avenue property because her mother's will was no good.

Elizabeth's deposition had been set for December 29 so her attorney might preserve her testimony in the suit to set aside the December 6 deed. In the meantime, Mr. Kappel received the heretofore-noted written direction to dismiss the case. Some time prior to December 29, Harry visited Mr. Kappel, told him to dismiss the suit or get hurt, not to go on the Pfeifer property, and said that he (Harry) ought to "punch" Kappel "in the nose." Because of Harry's visit, Kappel arranged for a deputy sheriff to accompany him, Mr. Berkman, and the shorthand reporter to the deposition. Present, in addition, were George, Elizabeth, Harry and his wife Loretta, Mr. Heyne, their attorney, and Mrs. Cull. The accounts of what took place related by plaintiff and her witnesses vary in some of the details but, generally speaking, those witnesses supported the following account. Harry and Loretta arrived after the others and immediately took Mrs. Pfeifer into another room and kept her there for some time. When they returned Mrs. Pfeifer seemed not herself, hollering "Who are you, what do you want? I want nothing to do with these men. I dropped

the whole case." Harry offered to throw out Kappel and Berkman. Kappel wanted Mrs. Pfeifer to be sworn (although it appears that Mr. Heyne objected to the taking of the deposition and thus it was intended to only swear in the witness and then postpone the deposition until a later date). And when she agreed to be sworn Harry and Loretta stopped her and then Mrs. Pfeifer said she didn't understand a thing and later said, "I don't want no fight. I never had a fight in my whole life"; whereupon Kappel, Berkman, and the reporter left without the deposition.

On January 12, 1954, Mrs. Pfeifer told Mr. Kappel via the telephone that she wanted the deeds set aside, that she wanted the home to be in George's name, the Lee Avenue property to go to Mrs. Cull, and the farm to Mrs. Cull and George, and that she did not want him to withdraw from the then pending case, and Mrs. Cull testified that her mother told George that she had so told Kappel immediately after the telephone conversation; that she said Harry had his share. George then said to his mother that if she went to court he thought Kappel would have her on his side and then the judge would put everything back in the estate again, the state would take over, and they wouldn't have any money; Ret and Harry would lose their car, he would lose his car, and everything would be gone.

On January 13, 1954, George said, "Mother, tell Edna about going to Florida," and her mother said, "I am not going to Florida." George was angry and said, "You told Harry and Ret last night you would go. What changed your mind?" Her mother was crying. She said she did not want to go.

Robert L. Probst, Elizabeth's nephew, had been living in Texas but returned in 1953 and thereafter had regularly visited her. Six months prior to the instant trial George Pfeifer said he and his mother were broke and Probst said further that Mrs. Pfeifer had not had enough food and clothing since December 1953. He discussed with Mrs. Pfeifer the deed to George and Loretta and she seemed "cloudy" about it. She would say, "Everybody wants me to sign papers and I won't sign any more papers for anybody."

Harry testified that when his grandmother was at his home on Thanksgiving 1953 she said she had a will but did not remember whether the members of his family were beneficiaries and asked him to find out through Mr. Oetting because she wanted to be certain that he was included inasmuch as his father had helped to earn the money to pay for the farm. (He also said at another place in his testimony that he heard of the Oetting will by accident.) Harry saw Mr. Oetting but was unsuccessful in obtaining any information about Mrs. Pfeifer's will. He so reported to his grandmother who then told him to have a new will prepared leaving the farm to him and George, the home to George, and the Lee Avenue property to Mrs. Cull. He prepared such a will after obtaining a memorandum pertaining thereto from his lawyer. Also at his grandmother's request he personally prepared the December 6 deed after it was outlined by his lawyer. The December 30 deeds (conveying the home to George and the rear 110 feet of the Lee Avenue property to George and Loretta) were prepared by Harry's lawyer.

George Pfeifer testified with reference to events leading to the preparation of the will and deeds that Oetting was at the home and obtained from his mother information from which to prepare a will. George said on direct examination that he was not present when, but knew, his mother had signed that will and she told him of its provisions, including the fact that she had left nothing to Harry or Elizabeth Heim. He testified on cross-examination that he not only was present at the signing of the Oetting will but read it to his mother while Mr. Oetting was still present and that after Mr. Oetting left George asked if that was the way she

wanted it and she said no, she wanted Harry's name in it, that she changed her mind about the Oetting will the very same day she had signed it. George said he suggested that Harry should have something and she said she wanted to change her will and that she wished him to have a new will prepared providing that one half the farm go to Harry and Loretta; that he wanted nothing to do with it but just then (three days prior to December 3) Harry and Loretta appeared and he suggested, and his mother agreed, that Harry have the will drawn.

George testified further that in April, shortly after the Oetting will was signed, his mother began to express and often thereafter expressed her wish that he and Harry have what she wanted them to have while she was living; that immediately after the December 3 will was signed and the others had left, his mother asked if everything was now "fixed up" and he said, "No, I don't have the property," and she instructed him to have deeds prepared for her signature; that he told Harry, who then "had the papers made up" and the next time Harry and Loretta came they had the December 6 deed. (There was only one deed signed December 6; the others were not signed until December 30.)

Harry, Nicholas Mike, the notary, and George Pfeifer each described the circumstances under which the various documents were signed by Mrs. Pfeifer. We shall set forth a composite of their accounts, noting any significant differences in their testimony. Mr. and Mrs. Mike, who were friends of Harry and Loretta, were, either or both, requested each time by Harry to accompany him and Loretta to the Pfeifer home for the purpose of notarizing or witnessing an instrument. On December 3 there were present in the Pfeifer home, Mr. and Mrs. Mike, Harry and Loretta, George, and Mrs. Pfeifer. Harry handed the will to George, who told his mother that it was the paper she wanted prepared and that Mr. Mike was there to witness her signature. George then read it to her and asked her several times whether that was the way she wanted it and she said "Yes." George then handed the will to Mr. Mike and he read it to Mrs. Pfeifer and asked her if that was the way she wanted it and she said "Yes." Then again, "We says, 'are you sure this is what you want' and we read it another time and she says, 'That's the way I want it.'" She signed, with George's help in finding the signature line, and George and Mr. and Mrs. Mike signed as witnesses.

On December 6, there were present the same parties as on the 3rd. Harry said to Mrs. Pfeifer, "This is the deed you told me to prepare," and handed it either to her or to George. In any event, George examined it and Harry explained it to George. George read it to himself, then read it aloud *two or three times* and then Mr. Mike read it aloud *twice*. Generally, the same procedure was followed as had been inaugurated on December 3, except Mr. Mike assisted Mrs. Pfeifer by placing her hand on the signature line, read the acknowledgment to her, and received her affirmation that it was her free and voluntary act.

On December 26 there were present the same parties as on the two prior occasions except Mrs. Mike. Mr. Mike recalled that Mrs. Pfeifer said, "I'll be glad when I get this whole thing done." The instrument to be signed was the direction to Kappel to dismiss the pending suit to cancel the December 6 deed. George read the paper to his mother and she asked what it was. George told her it was the letter she told him to have prepared to the effect that she did not want Kappel, "You did not want to file any suit against anybody." Mr. Mike then read it to her and she signed and said she did so freely and voluntarily.

On December 30 there were present the same parties as on December 26. Harry

brought the two deeds. George said to his mother, "here is another deed, if you want to sign it. You know you always say that you told me that if we ever needed any more ground on Lee Avenue that we could have it and this is the deed * * * you told me to go and have made up so that we can get that piece of ground." George read the deed to her and she said she was satisfied. Then Mr. Mike read the deed to her and he asked if she was satisfied and then read the acknowledgment to her and she wanted to and did sign. Although it is clear that in addition to the deed conveying the north 110 feet of the Lee Avenue property to George and Loretta, the deed conveying the home to George was executed also, the testimony contains no description of the ceremony connected with its execution.

Defendants' description of the deposition attempt on December 29 was generally that Mr. Kappel, in attempting to explain to Mrs. Pfeifer, got her excited and George and Harry and Loretta were trying to see to it that Mrs. Pfeifer was not imposed on. Mrs. Pfeifer asked Harry to tell Kappel, Berkman, and the reporter to get out of her house. Defendants denied taking Mrs. Pfeifer into another room at any time. Defendants' witness, the deputy sheriff who appeared at the deposition at Kappel's request, said he stayed in the background and remembered little about it; that he did not remember that Mrs. Pfeifer left the room although several groups disappeared into various rooms for conferences. There was loud and angry conversation, but the witness did not remember it.

Defendant Harry testified further that he had, some years before, received from his grandparents a deed to the roofing company lot which adjoined the Lee Avenue property in exchange for roofing work he did for them; that he had begun to operate Energetic Roofing Company after it had been inactive for several years; that he visited Mr. Kappel at his law office but did not threaten him; that Kappel refused to dismiss the pending case and said there was a "lot of sugar" in the case; that he made no attempt to keep Mrs. Cull away from her mother; that no one present threatened his grandmother or in any way forced or influenced or requested her to sign any instrument; that he did not threaten harm to George if George refused to witness a will or deed; that he made no statement about a meeting to divide the property or that if his grandmother did not treat him right there would be trouble; that Mrs. Pfeifer was of sound mind on December 3, 6, and 30.

George Pfeifer testified further that Harry did not threaten him and that he was not afraid of Harry and had had no trouble with him; that neither he nor Harry told his mother to execute a will and Harry did not speak to his grandmother in an abusive way or urge or tell her to sign a deed; that for years it was understood that he was to have the home and his mother always said the Lee Avenue property belonged to Mrs. Cull and his father and mother always said the farm would be divided between him and Harry; that he purchased two used Cadillac automobiles, one each for himself and Harry, Jr., from the cash his mother received from his father's guardianship estate; that he did not say something had to be done to correct what Harry had done or that Harry forced his mother to sign papers or that he (George) could not do anything but sign; that he did not keep anyone out of the home, did not suggest that Edna get a deed to the Lee Avenue property, did not tell Mr. Kappel that Harry put the pen into Mrs. Pfeifer's hand and said "Sign," did not tell his mother that he did not want Harry to have anything, and didn't tell Kappel he wanted him to bring a lawsuit.

George testified further that he did not know Mrs. Cull had gone to Des Moines; that he told Mr. Christy George to get them a lawyer to make a will and he referred

them to Mr. Kappel; that there was no conversation among Kappel, Berkman, his mother, and himself on December 16 pertaining to: setting aside the December 6 deed, someone placing a pen in his mother's hand, or filing a lawsuit; that he had no knowledge of his mother signing a contract employing Kappel; that Kappel told Mrs. Pfeifer that she was leaving her property to strangers and Mr. Christy George asked if she didn't think Mrs. Cull should have a part of the farm; that he obtained Mrs. Mandle as a witness to the will Mr. Kappel drew; that after Mr. Kappel left (after his mother had signed the will), his mother said that was not the way she wanted it and she said then she would never sign any more papers; that on December 19 his mother told Kappel to get out of the case—that was after she had signed the will on that same date.

Three of defendants' witnesses testified that they had visited Mrs. Pfeifer at the home at times between Thanksgiving 1953 and Easter 1954 and that she was of sound mind; that she told them she had given one half of the property across the road to Harry and wanted him to build there so his children could be near her; and that the affection for his grandmother displayed by Harry was returned by her.

A psychiatrist adduced by defendants testified that he examined Mrs. Elizabeth Pfeifer on May 4, 1954, to determine her competency and whether there were signs of mental illness. His conclusion was: "there was no evidence of any mental impairment or mental illness * * *, that she showed the mild memory changes of retention that you find in old people, * * otherwise she was perfectly well, capable to make decisions over her property"; that she did not appear to be suggestible or that she would be under her grandson's influence but appeared to be a very determined woman.

Mrs. Pfeifer's family physician for ten or fifteen years last saw Mrs. Pfeifer on December 10, 1955 (18 days prior to the date on which the doctor testified) and she was then suffering from influenza affecting the bronchial tubes. He prescribed bed rest "for some while" and since has talked with her son George by telephone. Apparently based only on his December 10 visit and subsequent telephone conversations with George, it was the doctor's opinion that she "still is not fully recovered from this condition * * * [and] at the present time she would be physically unable to be away from her home." The doctor was of the opinion that Mrs. Pfeifer was "quite capable of making her own decisions."

As noted heretofore , Mrs. Pfeifer did not testify at the instant trial. Defendants placed in evidence the transcript of the testimony she gave at the hearing (February 4, 1954) in connection with her motion to dismiss the suit then pending to set aside the December 6 and December 30 deeds. It will serve no useful purpose to here set forth a complete summary of all that testimony. We have studied it carefully and have reached the conclusion that that testimony, standing alone, is such that it would support either view with reference to the validity of Mrs. Pfeifer's motion to dismiss. That is to say, that testimony would constitute substantial evidence to support either the conclusion that Mrs. Pfeifer had independently and voluntarily decided to dismiss that pending suit, that she understood the nature and purpose of that suit, and consequently realized the effect of her decision to dismiss, or the view that Mrs. Pfeifer did not understand the nature and effect of that suit, that she was so under the domination of other of the defendants that her testimony at the hearing was in effect only the expression of their will substituted for hers so that her stated decision to dismiss was not an independent and voluntary one but was one caused by the prior undue influence and coercion by others of the defendants.

Without attempting to fully analyze her testimony, we set forth some examples from it to demonstrate the reason for the foregoing conclusion. Mrs. Pfeifer testified that she made a deed giving the farm to George and Loretta, but, in answer to the direct question whether it was her desire that those grantees should have that farm, she said, "Well, I don't know. We talked about it but then I can't just recall that. I know—I couldn't answer that. I don't know how I could." Immediately thereafter, however, in answer to another direct question, she stated unequivocally that she wanted those grantees to have the farm. When the court, through questions, was attempting to determine why she had deeded half the farm to Loretta instead of to Harry, she then, and at other points during her testimony, insisted upon describing what had happened when she signed the will which Mr. Kappel had drawn and which Mrs. Mandle witnessed. The court asked whether she had signed a deed giving George the home, and she answered, "Well, now, that is something I don't know what I signed." At one point in her testimony it seemed definite that she had no recollection of having deeded any part of the Lee Avenue property to George and Loretta. And yet at another point in her testimony she answered that she had deeded the rear part of it which Harry was to use in connection with his roofing business. She knew nothing whatever of having received $19,-000 in cash although she had signed a receipt for it, but indicated that George would have to be consulted about that. She was clear that she had never given George or Harry any money. Mrs. Pfeifer denied that she ever told Mr. Kappel to file the pending suit but insisted that she had always told him to "drop the case and let me alone." Yet she also testified that she couldn't answer whether she had a conversation with Mr. Kappel and Mr. Berkman telling them she did not want Harry to get anything and wanted the Lee Avenue property to go to her daughter and the home to George and the rest of the property to her son and daughter, and that she could not say whether she asked Mr. Kappel to come back in a few days and draw a will for her. And, in answer to the question whether she remembered signing a contract to have Mr. Kappel represent her and to file a suit, she answered, "I guess that is about right." In answer to the direct question whether she wanted the present case dropped, she said unequivocally, "I do, and I want them to let me alone."

We recognize that the foregoing references to Mrs. Pfeifer's testimony have been isolated from their context, but we set them forth to demonstrate the general nature of her testimony at the February 4 hearing.

While the record does not so show, the parties each in their briefs state that the trial court at the conclusion of the February 4 hearing sustained the motion to dismiss and that the case was dismissed, one of the parties said, "without prejudice." That means, of course, that the trial court at that time concluded that Mrs. Pfeifer was not only mentally capable to determine, but had in fact independently determined, to dismiss that case and that she understood the effect of that decision. The same trial judge, however, had to re-evaluate Mrs. Pfeifer's testimony when it was offered as evidence in the instant suit and, in so doing, to consider it in the light of all of the evidence which was offered in the present case. It is apparent that, as was his right and duty if so convinced, the trial chancellor changed his mind on the question of whether Mrs. Pfeifer independently, and not as a result of undue influence and coercion, had decided to dismiss the prior suit and that she understood the nature and effect of that decision. The trial court must have found that Mrs. Pfeifer's stated decision to dismiss was not in fact hers but that her statement was the result of coercion, in order to have determined that the daughter might maintain the suit as though she were the next friend or guardian ad litem of her mother.

We have set forth much of the testimony in this case and yet we have omitted much. We have considered all the evidence. We have accorded deference to the findings and conclusions of the trial chancellor which were dependent, as most of them were, upon the credibility of the witnesses who testified before him. Our review de novo in the light of the foregoing compels our conclusion that plaintiff sustained her burden to prove that she was a proper party to maintain the suit and sustain her burden to prove that the December 6 deed and the December 30 deeds were obtained by undue influence and are invalid and that her mother was entitled to other relief.

We shall not extend this already long opinion by attempting to fully review or analyze the evidence heretofore set forth. Briefly we shall point out some of the significant facts and circumstances which have caused us to reach our conclusion herein. Inasmuch as, in the main, the same facts and circumstances which have caused us to conclude that the deeds were obtained by undue influence have caused us to conclude also that plaintiff was a proper party to maintain the suit on behalf of her mother, we shall not make a separate review as to each question.

Significant to us are the accounts of the circumstances under which the documents were executed, related by the parties present at the execution of the December 3 will, and the December 6 and December 30 deeds. Those accounts, heretofore set forth, describe a course of conduct so unusual and contrary to common sense as to brand the entire conduct of the parties responsible for the execution of those documents as extremely questionable. Mrs. Pfeifer, who was supposedly, and according to the evidence, a grantor of unimpaired mental capacity and whose physical disability consisted only of defective eyesight, would need only to understand what property she was giving and to whom she was giving it. That would be a relatively simple thing to explain to one who had, according to the actors, affirmatively ordered the preparation of each of the documents involved. Yet the actors testified that the various documents were each read to Mrs. Pfeifer by each participant (by some, more than once), and that each party asked her several times if she understood and whether that was what she wanted to do. The parties present were overly meticulous.

It is significant that George Pfeifer admits that he requested Mr. Christy George to obtain a lawyer for him and his mother, and that Mr. George produced Mr. Kappel; yet after Mr. Kappel appeared, George Pfeifer, at the instant trial, in effect denied that there was any purpose in having Mr. Kappel present on December 16, i.e., he denied any discussion about setting aside a deed, signing instruments under duress, etc. Yet, after Mr. Kappel (in George's presence) obtained the information from Mrs. Pfeifer, from which Kappel drew a will, and returned to the home for the purpose of having that will executed, he needed another witness and George Pfeifer volunteered to and did obtain a neighbor lady, Mrs. Mandle, who witnessed that Mrs. Pfeifer signed the will after it had been explained fully to her.

We are decisively impressed, however, by the fact that one cannot read this record without discerning therein a pattern and finding that such a pattern must have evolved from an agreement among defendants George and Harry and Loretta as to the manner in which they would make certain that Mrs. Pfeifer disposed of her property in the manner in which they desired. To illustrate, none of the defendants attacks the circumstances of the execution of the Oetting will. That will seems to have been considered erroneous by Mrs. Pfeifer only after a suggestion to that effect by George. To replace the Oetting will, Harry drew a will, contrary to the

Oetting will, which made his wife a principal beneficiary. Only three days thereafter Harry prepared a deed conveying to his wife the same property she was to have received by the December 3 will. George Pfeifer was instrumental in obtaining the execution of both the will and the deed. What caused George Pfeifer, between December 6 and December 15 and 16, to want a lawyer to take steps to undo what Harry and Loretta, with George's active participation, had so recently accomplished, is not clear. It is clear, however, that he did wish to correct the situation which he had helped create. We say such is clear because we must conclude that the testimony of Messrs. Kappel and Berkman was credible. It is entirely unreasonable to believe, as instant defendants would have us believe, that two lawyers would visit the Pfeifer home, talk there with George and Mrs. Pfeifer, one of them immediately thereafter go to the county recorder's to examine the very deed by which Mrs. Pfeifer conveyed the farm to George and Loretta, and within two days thereafter bring a suit to set aside that deed, and that the other lawyer would return to the Pfeifer home three days after his original visit with a will which had to have been prepared as a result of the first visit and which disposed of some of Mrs. Pfeifer's property in a different manner than had the December 3 will, unless the testimony of Messrs. Kappel and Berkman as to what Mrs. Pfeifer and George Pfeifer told them on December 16 was substantially true and correct. In further effective corroboration of their testimony is the executed employment contract, of which George now denies knowledge even though he was present on the 16th when that contract was signed, but which contract admittedly bears Mrs. Pfeifer's signature.

Concluding as we do that the testimony of those lawyers is a substantially correct account of what was said in the Pfeifer home on December 16 and 19 and what was done as a result thereof, causes the further conclusion that George's testimony at the instant trial was not an accurate account of what occurred on those days and that George's sudden changes of mind and heart (considered in the light of his further change evidenced by his activity with reference to the December 30 deeds) must have resulted from activity by Harry and Loretta.

Furthermore, our finding that the testimony of Kappel and Berkman as to the events of December 16 and 19 was correct places Mrs. Pfeifer's testimony at the February 4 hearing in an entirely different light than it would have appeared standing alone. Mrs. Pfeifer, aged, feeble, and with defective sight, was nevertheless, according to the only medical evidence in the record, mentally alert for a woman of 89 and mentally capable of making her own decisions. Thus, Mrs. Pfeifer's denials that she instructed Kappel or agreed to instructions to him to institute a suit to set aside the deed, viewed in the light of the fact that those denials were not true, support the inference that Mrs. Pfeifer's ostensible decision to dismiss the then pending case was brought about by the same undue influence that caused her to execute the deeds and that her expressed desire to dismiss that case was not the result of her decision but was in fact the result of a decision by the other defendants.

As pointed out by defendants, old age, opportunity to influence, a request to convey, and the presence of a grantee when a certain instrument was executed, do not of themselves prove undue influence in the execution of a deed. Lape v. Oberman, Mo., 284 S.W.2d 538, 542 [5, 6]. When, however, a confidential relationship exists, as certainly existed between defendant George and his mother, and when activity such as is clearly shown in this case has occurred on behalf of the grantees in the deeds in question as a result, as we have found, of an agreement among the defendants, and which agreement was carried out by the assistance of the one standing in a confiden-

tial relation to his mother, undue influence is clearly and convincingly proved. As pointed out by the trial chancellor, defendants did not effectively rebut the presumption of undue influence which arose. Houghton v. West, Mo., 305 S.W.2d 407, 412 [6].

It is our conclusion, therefore, that plaintiff proved by clear and convincing evidence not only her right to maintain the present action on behalf of her mother, but that her mother was entitled to the relief granted by the trial court.

 The plaintiff, Mrs. Cull, surreptitiously took notes of what was said and done while she was present in the Pfeifer home from December 4 forward. Defendants contend that the trial court erred in permitting plaintiff to read the entries appearing in the book which she had prepared as and for her testimony in the instant case. The difficulty with that contention is that it is not sustained by the record. The trial chancellor ruled that the witness could refresh her memory from the entries in her book. Upon suggestion from defendants' counsel that it was apparent that the witness was reading from the book, the trial chancellor ruled that she was only refreshing her memory. There is no contention that plaintiff's book could not properly be used by the witness to refresh her memory. We, of course, defer to the ruling of the trial chancellor who saw the witness making whatever use she made of the book.

The judgment is affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.