Herman John SPAETH, Anna M. Schonfeld, Albert Spaeth, William Spaeth, August W. Spaeth, and Ruth Kriete, Plaintiffs-Respondents,

v.

Lester Leo LARKIN, Administrator et al., Defendants-Appellants.

No. 47115.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Dubail, Judge & Kilker, Charles R. Judge, St. Louis, for appellants.

Thurman, Nixon & Blackwell, J. W. Thurman, Jeremiah Nixon, Earl R. Blackwell, Hillsboro, for respondents.

HOLMAN, Commissioner.

On August 30, 1949, Louisa Spaeth purportedly executed a quitclaim deed which conveyed the property located at 3131 Leola Avenue, St. Louis, Missouri, to her daughter, Louise Larkin. Mrs. Spaeth died intestate July 31, 1953, at the age of 83 years and there has been no administration upon her estate. She was survived by seven children. On August 4, 1954, Louise Larkin conveyed the above-mentioned property to her two daughters, Helen Spector and Ruth Waters, but she reserved a life estate therein. This suit was instituted on May 31, 1956. The plaintiffs are six of the children of Louisa and the defendants were Louise Larkin and her two daughters. The petition contained three counts. Count I sought to set aside the afore-mentioned deed alleging as grounds therefor (1) mental incapacity, (2) undue influence, (3) forgery, and (4) lack of consideration. Count II contained a prayer seeking to quiet the title to said land, and Count III

sought to partition the property among the seven children (heirs) of Louisa, and in connection therewith, sought an accounting from Louise as to rents collected from said property. By agreement, Count I was first tried and the court entered a decree setting aside said deed upon all of the four grounds alleged. The defendants duly appealed but, pending the appeal, Louise Larkin died and her administrator, Lester Leo Larkin, has been substituted as an appellant in her stead. At the trial Louise Larkin was regarded as the primary defendant and, for convenience (even though she is no longer a party), we will refer to her as the defendant.

■ It is obvious that plaintiffs could not have obtained any relief in connection with Counts II and III unless they prevailed upon Count I. Because of that situation, a colloquy occurred between counsel and the court during the presentation of plaintiff's evidence which, as we construe it, resulted in an agreement, in effect, that Count I should be tried at that time and that Counts II and III should be held in abeyance pending the final adjudication of the first count. This appeal therefore involves only the issues presented in that count. We have appellate jurisdiction because title to real estate is involved. Article 5, § 3, Constitution of Missouri 1945, V.A.M.S.

At the beginning of the trial plaintiffs presented Judge Sam M. McKay, Probate Judge of Jefferson County, and Mrs. Agnes Lee, teller of the Arnold Savings Bank, each of whom produced and identified certain documents and signature cards showing the signature of Louisa Spaeth upon various dates between 1936 and 1946. These documents were used during the trial for comparison of the signatures thereon with the signature on the instant deed in connection with the issue of forgery. Upon the issues generally, plaintiffs offered the testimony of Mrs. Pauline Hixson, the daughter of plaintiff Anna Schon-

feld and the granddaughter of Mrs. Spaeth, and also William A. Schonfeld, father of Mrs. Hixson and husband of Anna Schonfeld. Mrs. Hixson testified that she saw her grandmother about three times a week from 1946 until her death in 1953; that during said period her grandmother lived on the second floor of the residence in question and that her son, Albert Spaeth, lived with her during that time; that Mr. and Mrs. August Spaeth lived in the downstairs portion of that property during that period; that Mrs. Spaeth gradually deteriorated, physically and mentally, from 1946 until her death; that during that period she would "stash" food in the furniture which the witness would clean out upon her visits; that at times when the witness would be at the Spaeth home her grandmother would not recognize her or her (Mrs. Hixson's) son; that defendant lived less than a block from her mother, Mrs. Spaeth, and she saw defendant at the Spaeth home about once every two weeks; that about once each week she would see Howard Eaton at the Spaeth home; that he would come at noontime and bring a "pot of food" to Mrs. Spaeth from defendant; that another of Mrs. Spaeth's children, William, worked in Detroit but would visit his mother when returning to St. Louis on his vacations.

William A. Schonfeld testified that he had seen Mrs. Spaeth quite often (perhaps 150 times) during the period from 1946 to 1953; that during that period she suffered a gradual deterioration in her physical and mental condition and sometimes would not know him.

The final witness for plaintiffs was George G. Swett, "an examiner of questioned documents, commonly referred to as a handwriting expert." He testified concerning certain photographic studies he had made of the signature of Louisa Spaeth upon the instant deed in comparison with her signature upon certain other documents in evidence. It was his opinion that the first name of the signature on the deed had originally been written as

"Louise" and had then been written over so as to read "Louisa." He expressed the further opinion that the signature on the deed was not executed by the same person that executed the signatures upon other documents in evidence.

Plaintiffs also offered in evidence a deed of trust dated August 24, 1949, which had been executed by Mrs. Spaeth (by mark) securing a note for $600, and six interest notes, all of which were admitted in evidence, and which instruments had been in the possession of defendant and were produced, upon request, by her attorney.

In presenting their case defendants offered the testimony of three of the officers and employees of the Hauschulte Real Estate Company of St. Louis. Henry W. Bader testified that he and Albert Spaeth were the witnesses to the mark of Louisa Spaeth when she executed the notes and deed of trust on August 24, 1949. Mr. Alfred P. Imming testified that Mrs. Spaeth made marks in executing the deed of trust and seven notes secured thereby; that said loan was paid in full on October 28, 1949, and the papers were delivered to Mrs. Louise Larkin. In connection with the execution of the instant quitclaim deed this witness testified that Mrs. Spaeth and Mrs. Larkin came to the office on August 30, 1949, and Mrs. Spaeth asked to have a deed prepared conveying the property to Mrs. Larkin; that the witness caused the deed to be prepared and Mrs. Spaeth signed it in his presence; that he did not think the signature was clear so he suggested that it should be witnessed, and, the witness and Louise Larkin each signed as witnesses to the signature; that the notary, Mr. Wehrle, asked Mrs. Spaeth if "it was her free act and deed" and she replied that it was. The deed was filed for record on the same day it was executed. A deposition of this witness had been taken prior to the trial and, by agreement, was admitted in evidence in its entirety for the purpose of impeachment. It is sufficient to state that the deposition indicates that at the time it was taken the witness did not

have an independent recollection of many of the facts testified to at the trial.

Mr. Frank J. R. Wehrle was the notary who took the acknowledgment of Mrs. Spaeth on both the deed and the deed of trust. He testified positively that he was present and saw Mrs. Spaeth sign her name to the deed and that in response to his question, "if that was her free act and deed," she said "yes." In explaining why Mrs. Spaeth had signed the deed of trust by mark and had written her signature upon the quitclaim deed six days later, the witness stated that when the deed was executed Mrs. Spaeth first stated that she couldn't write, but that "Mr. Imming said, 'You have written before. Write your name down there,' so she wrote her name." Also, the deposition of this witness was, by agreement, admitted in its entirety for the purpose of impeachment. We have read the deposition and consider it sufficient to state that it indicates that at the time of the taking of the deposition the witness did not have an independent recollection of certain facts testified to at the trial.

One of the daughters of Louise Larkin, Ruth Larkin Waters, testified that she had been employed by plaintiff Herman Spaeth in 1952 at his restaurant. She further testified to certain statements made by Herman which indicated that he knew of the instant deed and fully recognized Mrs. Larkin's ownership and control of the property. The other daughter, Helen Larkin Spector, testified that August Spaeth had paid rent to her mother from 1949 until this suit was instituted for use of the downstairs of the instant property; that Albert did not pay any rent while his mother lived but had paid rent at the rate of $10 per week to Mrs. Larkin after the death of Mrs. Spaeth.

Lester Leo Larkin, husband of defendant, testified that shortly before her death, when Mrs. Spaeth was in the hospital, she stated, in the presence of Louise and Albert, " 'Louise, as long as I live I wouldn't

charge Albert anything for his stay, but should I die I know he will pay you for his keep.' And she called him there. She said, 'Do you hear what I said, Albert?' He said, ' Mom, I'll do it.' " This witness also stated that when Mrs. Spaeth died William Spaeth told defendant that "he was glad she had taken over; he knew she would take care of grandma." He also related that when plaintiff Ruth Kriete was in the hospital in 1951, she told defendant that she had done the right thing in taking the deed and that she, Ruth, "would never have to worry about Mom any more." Mr. Larkin also testified that the instant property was worth about $6,000.

There was evidence to indicate that Albert Spaeth received the $600 which Mrs. Spaeth borrowed on August 24, 1949, and that he had also withdrawn about $3,400 from a joint bank account of Louisa and Albert Spaeth during 1949. There was also evidence to the effect that defendant had paid the real estate taxes on the property in question after 1942 and had paid the maintenance expenses thereon.

▆ In this equity case the burden was upon plaintiffs to prove by convincing evidence that the instant deed was invalid and hence should be set aside. "On this appeal we weigh the evidence and arrive at our own conclusions as to its weight, taking into account the trial chancellor's position to judge the credibility and characteristics of the witnesses who testified before him." Cull v. Pfeifer, Mo.Sup., 307 S.W.2d 424, 428.

▆▆ We are unable to find any substantial evidence in the record which would tend to support the allegation that the deed was obtained by defendant as the result of undue influence over the grantor and hence we will give no further consideration to that issue. We are also not impressed by the contention that there was no consideration for the deed, as "a voluntary conveyance, without valuable consideration, is valid as between the parties. Binnion v. Clark, 359 Mo. 202, 221 S.W.

2d 214, 217, and authorities there cited. To set a deed aside or otherwise invalidate it there should be 'some other compelling circumstance' besides a mere lack of consideration (id). And see 26 C.J.S. Deeds § 16; Robinson v. Field, 342 Mo. 778, 117 S.W.2d 308; Stoops v. Stoops, Mo., 276 S.W.2d 188; 16 Am.Jur., Deeds, § 57." Rubinstein v. Rubinstein, Mo.Sup., 283 S.W.2d 603, 607. The deed recited a consideration of one dollar and the grantee also agreed therein to pay the $600 deed of trust heretofore referred to, which sum she did pay shortly thereafter.

▆ The evidence relied on by plaintiffs as proof of grantor's mental incapacity is the testimony of Mrs. Hixson that her grandmother had gradually deteriorated after 1946 and would "stash" food in the furniture, and, upon occasions during the last eight years of her life Mrs. Spaeth would not recognize the witness or her son. Mrs. Hixson's father, William Schonfeld, also testified that "from 1946 to the time of her death, she was slipping. Sometimes she wouldn't know me." No medical testimony was offered concerning either the physical or mental condition of Mrs. Spaeth. We think it is significant that no witness expressed the opinion that grantor was, at any time, a person of unsound mind.

We are considerably impressed by the fact that none of the plaintiffs were offered as witnesses. Albert lived with his mother during the period in question and must have had a better opportunity than any one else to observe her and form an opinion as to her mental condition. Also, August and his wife occupied the downstairs portion of the property during the last seven years of grantor's life and must have observed her almost every day. All of the other children, except William, lived in the St. Louis area and apparently saw their mother from time to time. As stated, William lived in Detroit but would visit with his mother during his vacations. It was to the advantage of the plaintiffs to

have the deed set aside. If they had knowledge of facts tending to prove the mental incapacity of their mother they should have testified accordingly. "It is well settled that the failure of a party having knowledge of the facts and circumstances vitally affecting the issues on trial to testify in his own behalf, or to call other witnesses within his power who have knowledge of such facts and circumstances, raises a strong presumption that such testimony would have been unfavorable and damaging to the party who fails to proffer the same." Block v. Rackers, Mo.Sup., 256 S.W.2d 760, 764.

■■ Counsel for plaintiffs seek to explain the failure of plaintiffs to testify by taking the position that they were disqualified under Section 491.010 RSMo 1949, V.A.M.S., the so-called "dead man's statute." We do not agree. It is true that plaintiffs were claiming (as heirs) under Louisa Spaeth who was deceased. The foregoing section provides, in part, that "in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor * * *." However, if Louisa had been alive she would not have been disqualified, as the other party to the deed, Louise Larkin, was, at the time of trial, living. If Louisa would not have been disqualified, those claiming under her are not disqualified. Moreover, the statute does not render a witness incompetent for all purposes and therefore, in any event, if the testimony of plaintiffs would have been favorable to their cause, they should have been offered as witnesses and defendants could then have objected or not as they saw fit.

On the other hand, we observe that defendant did not testify (or appear at the trial) but according to medical affidavits in evidence she was suffering from heart disease and was not able to appear in court. We are also mindful that while defendant's husband and two daughters did testify they were not interrogated in regard to the mental condition of Mrs. Spaeth. In reaching our conclusion herein we have not overlooked the fact that those witnesses did not testify concerning the mental condition of Mrs. Spaeth and that such failure would perhaps warrant an unfavorable inference against defendants upon that issue. However, since defendants do not have the burden of proof, we do not think that inference is as significant as the unfavorable inference which attaches to the failure of plaintiffs to offer themselves as witnesses.

■ If grantor could reasonably understand "the nature and effect of his acts and if he had the mental capacity to know the extent of his property and his relatives and their claims on his bounty, he had sufficient mental capacity to make * * * the deeds in question." Walton v. Van Camp, Mo.Sup., 283 S.W.2d 493, 500. Considering the fact that there is no medical testimony to the effect that grantor was mentally disabled at or near the time of making the deed, and considering the very general nature of the testimony of the lay witnesses, and further considering the fact that none of the six plaintiffs were offered as witnesses, we have concluded that the evidence is not convincing upon the issue of mental incapacity and hence plaintiffs are not entitled to the relief sought, upon that ground.

■ Finally, we will consider the contention of plaintiffs that the deed was not executed by Mrs. Spaeth but that her signature thereon was forged. In support of that issue plaintiffs presented the testimony

of a handwriting expert who expressed the opinion that the signature appearing on the deed was not executed by the same person that executed the signatures upon the other documents (apparently unquestioned signatures of Louisa Spaeth) in evidence. On the other hand, the evidence is undisputed that Mrs. Spaeth was present at the real estate office at the time the deed was prepared, executed and acknowledged. That circumstance would seem to justify the inference that she either signed the deed or adopted the signature if it was placed thereon by another. The fact that she may not have signed the deed would not compel the conclusion that the deed was invalid. "As a general rule, it is not essential to the validity of a deed that the grantor should actually affix his signature thereto with his own hand, and the source or nature of its execution is immaterial if he adopts such signature or acknowledges it as his own." 26 C.J.S. Deeds § 34(a), p. 663. See also Woods v. Payne, Mo.Sup., 206 S.W.2d 355.

Furthermore, Mr. Imming and Mr. Wehrle, two apparently disinterested witnesses, both testified that they saw Louisa Spaeth sign her name to the deed and that she answered affirmatively when Mr. Wehrle asked if such was her free act and deed. Mr. Imming also testified that Mrs. Spaeth requested the preparation of the deed conveying the property to Mrs. Larkin. The testimony of these witnesses at the trial showed a much greater independent recollection than they possessed at the time of the taking of their depositions. While that fact may weaken the force of their testimony to some extent, we are inclined to think that they were able to refresh their recollections during the intervening period by reference to their records and the documents involved.

A review of all of the evidence upon the issue of forgery has caused us to conclude that the evidence is not sufficient to warrant a court in setting aside the instant deed upon the ground that the grantor's name was forged thereon.

 "The cancellation of a deed is an exercise of the most extraordinary power of a court of equity and this power ought not to be exercised except in a clear case." Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 67. As indicated, we are unable to sustain the conclusion of the trial court that the deed should be set aside. It is our view that the evidence is not sufficiently convincing, upon any of the grounds pleaded, to justify the cancellation of the deed.

The judgment is reversed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.