**Cora R. DRAKE, Respondent,**

v.

**Buford W. GREENER and Aliene D. Greener, Appellants.**

**No. KCD 26952.**

Missouri Court of Appeals, Kansas City District.

May 5, 1975.

Elliot Norquist, Harlan D. Burkhead, Kansas City (Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, of counsel), for appellants.

William L. Pollard, William H. Norton, Jr., Norton & Pollard, North Kansas City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Action in equity by plaintiff-grantor to set aside her deed purporting to convey certain real estate to herself and defendants as cograntees. The court found the conveyance in question was fraudulent, without any consideration, the result of undue influence exercised by defendants over plaintiff at a time when she was sick, ill, and infirm, and was done while defendants were in a confidential relationship with her; set aside the deed, and declared defendants to have no interest in the land in question.

Appellants contend "the judgment * * is not supported by 'clear, cogent, and convincing evidence' necessary to invoke the 'most extraordinary power of a court of equity,' " Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59 (1943), and therefore should be reversed.

Appellants argue, on the issue of deference to the trial court's findings, that "there are * * * no serious conflicts in the oral testimony on the issues which the Court decided"; on the issue of lack of consideration, that "there is no evidence in the record whatsoever as to consideration or the lack thereof," citing Spaeth v. Larkin, 325 S.W.2d 767, 771[4] (Mo.1959), that a voluntary conveyance, without valuable consideration, is valid as between the parties, and Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69, 70 (1943), that "the deed was one of gift, hence the question of consideration is not involved"; that a confidential relationship per se, even if established, does not warrant the cancellation of a deed unless there is other independent evidence of undue influence, Mintert v. Gastorf, 417 S.W.2d 101 (Mo.1967); on the issue of fraud, that "there is no evidence which even remotely measures up to the required showing for the plaintiff to prevail on fraud," citing Gibson v. Smith, 422 S.W.2d 321, 327 (Mo.1968), that "the difficulty of proving fraud does not dispense with the necessity of making the required proof. Nor is fraud ever presumed"; and, on the issue of undue influence, "all that the plaintiff by any stretch of the imagination has proved is that * * * she was in a weakened physical condition and therefore perhaps a susceptible target for undue influence."

Respondent, of course, considers that the evidence sustains her burden of proof and, in particular, shows her deed was obtained without any consideration through both undue influence and fraud, and, therefore, the judgment should be affirmed.

■ This case is for review upon both the law and the evidence, with due regard to be given to the opportunity of the trial court to have judged the credibility of the witnesses. Rule 73.01, subd. 3(a), (b), V.A.M.R.

Plaintiff Cora R. Drake is the widow of John Drake who died in June, 1967; codefendant Aliene D. Greener is the daughter by a former marriage of John Drake, deceased, and codefendant Buford W. Greener is the husband of Aliene Greener and Executor of the Estate of John Drake, deceased.

The property in question was purchased by the late John Drake in 1961, prior to his marriage to plaintiff. Cora and John Drake were married in September, 1961, and lived as man and wife in the subject house and property, Lot 58, Hamilton Heights, an addition in the City of Gladstone, Clay County, Missouri, until his death June 12, 1967. Mrs. Drake acquired the property under her late husband's will which devised his real estate to his wife.

On June 22, 1967, one week after the burial of her husband, Mrs. Drake suffered a heart attack and was hospitalized at North Kansas City Memorial Hospital until July 14, 1967. Mrs. Drake's medical treat-

ment during hospitalization, post-hospitalization care during convalescence, and subsequent attention until a second heart attack in January, 1969, was administered by Dr. James W. Hall. Mrs. Drake also had the services of a full-time housekeeper, Harriet Collier, upon her release from the hospital for two or three months or until the latter part of 1968.

On July 30, 1967, plaintiff executed the deed in question purporting to transfer her property from plaintiff to plaintiff and the codefendants in joint tenancy. Although the deed expressed a consideration of "Ten Dollars and other valuable considerations," there is no evidence or claim that any other consideration moved between the parties. Mrs. Drake was 71 years of age. She never remembered signing the deed or going to the office of the notary public, now deceased, who was purported by the deed to have taken her acknowledgment. She had a period of mental confusion after her heart attack and at times things "went blank." She never intended to convey any interest in the property to Mr. and Mrs. Greener. Her first knowledge that she had conveyed any interest in her property to defendants was in the fall of 1968 when she received her tax statement showing Mr. and Mrs. Greener as cotenants. She was shocked at this revelation; prior good relationship between her and Mr. and Mrs. Greener came to an end; and, as early as January, 1968, she had retained counsel to assist her with her affairs.

Buford Greener admitted that Mrs. Drake did not ask him to have a deed made. "I suggested that she might do it this way with advice from * * * Betty Bond [one of Mr. Greener's attorneys assisting him in the Estate of John Drake, deceased]." Mr. Greener had the deed prepared by Mrs. Bond and took it to Mrs. Drake for execution July 30, 1967. At the same time he presented an "Application of Surviving Spouse For Family Allowance" to Mrs. Drake which also had to be signed and acknowledged in order that she might draw

a cash allowance of $3,500 for that purpose from the estate of her deceased husband. Mr. Greener maintained that he explained to Mrs. Drake what the deed meant in that it would put the property "in the name of Aliene Greener, myself and her." He did not tell Mrs. Drake that in the event she predeceased Mr. and Mrs. Greener that the deed would preclude her blood daughter, although he knew "this would be the normal thing." Mr. Greener also evidenced some confusion with respect to where and when the deed was acknowledged by the notary public, O. W. Fry, who was deceased at trial time. He denied any intention to take Mrs. Drake's property from her, but he was also unwilling to deed it back to her.

Aliene Greener gave as her version that Mrs. Drake told her that since the property had belonged to her father, and since her own daughter was in Texas and would not want the house, it should go to her. She also gave as part of her version that she was worried about her dad's house going into probate and standing vacant for a year if anything happened to Mrs. Drake and conveyed this thought to her. This led to Mr. Greener's advice that a joint tenancy deed might be the answer.

After the deed was signed, Mrs. Drake continued to live in her house. She made the mortgage payments, paid the taxes and sewer assessments, and paid repair and maintenance costs, all without help from defendants despite their claim of ownership of the property in joint tenancy with Mrs. Drake.

Theresa Lou Roberts, Mrs. Drake's own daughter by a prior marriage, came to Kansas City following her mother's heart attack June 22, 1967, and stayed until her mother was released from intensive care about a week later. She then returned to her home and work in Texas, keeping in daily telephone communication with her mother until she left the hospital. She continued her telephone communication on alternate days for several months. She also communicated

with Dr. Hall, Kay Mackey and Sue Lett, neighbors of Mrs. Drake. Her mother never mentioned any conveyance of her home to Mr. and Mrs. Greener until 1968 when she received a tax statement with their names on it. She verified her mother's shock following receipt of this knowledge and advised her mother to get a lawyer. By virtue of her personal observations of her mother and telephone conversations with her, Miss Roberts felt her mother experienced mental confusion and lack of recall during her hospitalization and convalescence.

Katherine Mackey met Mrs. Drake in the summer of 1967, joined Miss Roberts at the hospital June 22, 1967, following Mrs. Drake's heart attack, visited Mrs. Drake in the hospital once or twice a week after her release from intensive care, and saw her similarly after her release from the hospital. She observed Mrs. Drake's weakened mental and physical condition, and inability to recall. Mrs. Drake called her in 1968 when she received the tax statement and asked her to explain what was meant by the presence of the Greener names on it.

Sue Lett, a neighbor and friend of Mrs. Drake, first became acquainted with her in June, 1967. She made observations of Mrs. Drake similar in frequency and substance to those made by Mrs. Mackey. She also noted Mrs. Drake's complete dependency on her housekeeper, Mrs. Collier, following her release from the hospital; confirmed Mrs. Drake's confusion with respect to the tax statement, and advised her to consult an attorney.

Ernestine Whitters, a neighbor and friend of Mrs. Drake since 1961, saw Mrs. Drake in her home two or three times a day following her hospitalization. She noted her lack of awareness and forgetfulness. She and Mrs. Collier collaborated in an attempt to teach Mrs. Drake to knit but could not accomplish much due to Mrs. Drake's condition. In her opinion, Mrs. Drake would not have been competent to execute legal documents on July 30, 1967, and not until Christmas of that year did she begin to act like herself.

According to Dr. James Hall, Mrs. Drake's illness beginning June 22, 1967, was a coronary or heart attack. Dr. Hall had little verbal communication with his patient and would not necessarily have noted any nonresponses or confusion on hospital records because he anticipates this with elderly patients and does not consider it a serious medical problem. His records show weakness complaints while his patient was hospitalized, and weakness complaints and leg numbing on August 11, 1967, after her discharge. At this time he prescribed vitamin shots as a psychogenic aid to Mrs. Drake. Medications prescribed by Dr. Hall in the hospital and after discharge, particularly Coumadin, an anticoagulant, related to problems of blood circulation resulting from her heart attack and existent hardening of the arteries. Her arteriosclerosis and heart attack could produce an interference with her mental process. Dr. Hall felt his patient made a reasonably good convalescence, but she was not "the best patient" because she did not follow his prescribed program. She "disappeared" from his practice in September, 1967, until she was readmitted following a second heart attack on January 14, 1969.

Aliene Greener called the ambulance to take her stepmother to the hospital when she had her heart attack. She visited Mrs. Drake daily during her hospitalization and did not observe any mental confusion. Upon Mrs. Drake's discharge, Mrs. Greener visited in her home approximately three times a week, took her to the doctor on one occasion, and conducted a garage sale with her in the fall of 1967. In her judgment, there was nothing to indicate that Mrs. Drake was not in possession of her faculties on July 30, 1967.

Buford Greener also visited Mrs. Drake in the hospital and observed her at home after her discharge. He "felt she understood"

the nature and character of her acts with respect to distribution of her property. He denied any force in causing Mrs. Drake to execute the deed in question.

Fay Collison, an aunt of Aliene Greener, talked with Mrs. Drake after her husband's funeral and did not feel she exhibited any mental confusion. She did not see Mrs. Drake again until August 24, 1967, at a birthday party. She saw no difference in Mrs. Drake's ability to speak or converse.

Reverend George Hilbert was the minister of Christ Unity Church in North Kansas City where Mr. and Mrs. Greener and Mrs. Drake are members. He first met Mrs. Drake when her husband died and he conducted the funeral service. He saw Mrs. Drake in the hospital on one occasion for fifteen to twenty minutes of conversation, probably of a spiritual nature, in which she said or did nothing to indicate mental confusion. According to him, Mrs. Drake joined his church in October, 1967, and made contributions from time to time. Mrs. Drake did not recall joining the Unity Church, but did discover she had made some "heavy donations" upon examination of her canceled checks.

The question is whether there was an absence of consideration for the deed in question coupled with undue influence or fraud in its procurement to justify its cancellation by the court.

■ The general rule is that mere absence of consideration is not sufficient to warrant relief by way of equitable cancellation of an executed contract or deed in the absence of some additional circumstance creating an independent ground for granting cancellation, such as fraud or undue influence. But where a person has been induced to part with a thing of value for little or no consideration, equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice in the particular case. 13 Am.Jur.2d 516, Cancellation of Instruments, § 21; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620, 624[8] (1954); Radford v. Radford, 388 S.W.2d 33, 39[5] (Mo.1965).

■ It is equally well recognized that undue influence exists in cases of confidential or quasi-confidential relationship where the power of a person receiving a gift or other benefit has been so exerted on the mind of the donor by improper acts or circumvention that the donor was induced to act contrary to his deliberate judgment, reason or discretion. Factors given careful consideration in determining whether a deed should be canceled on the ground of undue influence include the extreme age of the grantor, his impaired physical condition, his mental debility not necessarily amounting to complete incompetency, and the absence of competent and bona fide independent advice. 13 Am.Jur.2d 523, Cancellation of Instruments, § 30; Hamilton v. Steininger, supra, 168 S.W.2d l.c. 68[6, 7]; Dingman v. Romine, 141 Mo. 466, 42 S.W. 1087, 1088 (1897); Morris v. Morris, 4 S.W.2d 459, 463[4] (Mo.1928); Wilhoit v. Fite, 341 S.W.2d 806, 813[1–3] (Mo.1960).

■ Also a court is particularly inclined to cancel a contract (or deed) on the ground of fraud in its procurement where a confidential relationship was involved and instrumental in the execution of the contract. Not only fraudulent or unfair misrepresentation but also fraudulent or unfair concealment may be sufficient ground for cancellation of an instrument if the fact concealed from the party seeking such relief is material and one as to which there is a duty on the opposing party to disclose. 13 Am.Jur.2d 510, Cancellation of Instruments, § 15; Hudspeth v. Zorn, 292 S.W.2d 271, 275 (Mo.1956); Frey v. Onstott, 357 Mo. 721, 210 S.W.2d 87, 93 (1948); and fraudulent representations will entitle the aggrieved party to relief where the misrepresentations concern something unknown to the injured party who has been induced to act from some special confidence reposed in the other

party, Bailey v. Smock, 61 Mo. 213, 217 (1875).

■ Although the deed in question recites a consideration of "Ten Dollars and other valuable considerations," sufficient to support the deed as a conveyance, defendants concede that they paid nothing by way of consideration. Any claim they make that the deed was one of gift or grant in lieu of testamentary disposition is overcome by the grantor's testimony that she never intended to convey any interest in her property to the defendant grantees. This is reinforced by her retention of counsel to assist her immediately upon learning that such a conveyance existed. Accordingly, the court properly found the deed was without consideration. Frey v. Onstott, supra, 210 S.W.2d l.c. 93.

■ The relationship between the grantor and her purported grantees was not a classic fiduciary relationship such as that of attorney and client, conservator and ward, trustee and beneficiary, broker and principal, or partners, etc. Mrs. Drake's husband died forty-eight days before she executed the deed in question purporting to convey an interest to Mr. and Mrs. Greener in real estate which she acquired upon the death of her husband by virtue of his will. Both Mr. and Mrs. Greener undertook to advise her with respect to disposition of her real estate. Mr. Greener was the executor of the will, and he procured her execution of the deed in question at the same time he obtained her signature on the probate form necessary to her claim for family allowance from the estate funds, and she had no other interest in the personal property of the estate. Too, a friendly relationship existed between Mrs. Drake and Mr. and Mrs. Greener throughout her six-year marriage to Mrs. Greener's father and after his death until the fall of 1968 when Mrs. Drake discovered that Mr. and Mrs. Greener were now cotenants in the title to her inherited real estate. Appellants do not deny the presence of a confidential relationship. In these circumstances, the court properly found that there did exist a confidential relationship between grantor and grantees. Youtsey v. Hollingsworth, 178 S.W. 105 (Mo.1915); Bailey v. Smock, supra. Such circumstances also show the opportunity of the grantees to exercise undue influence on the grantor. Morris v. Morris, supra, 4 S.W.2d l.c. 463[3].

■ As previously indicated, it is proper to consider physical and mental conditions of the grantor in determining whether she may have been unduly influenced. At the time Mrs. Drake purportedly signed the deed in question, she was 71 years of age, had lost her husband forty-eight days previously, had sustained a heart attack thirty-eight days previously, had been hospitalized until sixteen days before the act, and was infirm in both body and mind at the time of the act. Such a combination of age and physical and mental infirmity is enough that "the suspicions of equity are aroused." United States v. Pettyjohn, 93 F.Supp. 177, 179–180[1] (D.C.W.D.Mo.1950). In these circumstances, the grantor was susceptible to an exercise of influence.

■ Another consideration in determining the presence of undue influence is an unnatural disposition of property. Morris v. Morris, supra. This is present in this case in that the conveyance from Mrs. Drake to Mr. and Mrs. Greener would operate to preclude Mrs. Drake's natural daughter and heir, Theresa Roberts; and this effect of the deed was known by the grantees and was not made known to the grantor.

■ A confidential relationship has been previously determined to exist between the grantor and grantees. Advanced age and physical and mental impairment of the grantor which made the grantor susceptible to an exercise of undue influence, opportunity in the grantees to exercise their

influence, an unnatural and unintended disposition made of the grantor's property, active participation of the grantees in suggesting that the deed be made and executed, and the absence of bona fide independent advice to the grantor with respect to the deed, are all shown by the evidence. When these factors are coupled with the previously determined absence of consideration, a classic case of undue influence to warrant cancellation of plaintiff's deed has been made. Morris v. Morris, supra. Accordingly, the court properly found the deed resulted from undue influence.

Appellants cite four cases deserving of distinction. In Hamilton v. Steininger, supra, the unsuccessful plaintiffs were the heirs at law of the deceased grantor who had the deeds in question in her possession for several days at the time of execution, and she was of sound mind and showed no regret, repudiation, or disaffirmance of her deeds during her remaining lifetime. By contrast, Mrs. Drake never had the deed in question in her possession, she never intended to make it, and she took steps to repudiate and disaffirm it immediately upon learning of its existence and effect. In Hedrick v. Hedrick, supra, the trial court found the evidence insufficient to justify cancellation. The grantor was deceased, and the deed in question was made to the benefit of her daughter after independent advice from a lawyer. By contrast, Mrs. Drake's purported deed was procured for the benefit of Mr. and Mrs. Drake to the exclusion of her own daughter and was procured without giving the grantor an opportunity to seek independent advice. In Spaeth v. Larkin, supra, the plaintiffs were six of the grantor's daughters and the deed

in question was made to the benefit of yet another daughter. Again, by contrast, Mrs. Drake's purported deed benefited persons to the exclusion of the single natural object to her bounty and she took steps to repudiate it at an early opportunity after learning of its existence. In all three of these cases the deceased grantor was shown to be of advanced age and eccentric, but there was no indication that they suffered impairments which would reduce their competency to make a deed at the time they executed their deeds. In Mintert v. Gastorf, supra, the unsuccessful plaintiff-grantor admitted he had had independent advice of counsel with respect to his deed, and any appearance of undue influence on the part of defendants-grantees was sufficiently rebutted to provide a fact question which the trial court resolved against the grantor.

Similarly, with respect to the presence of fraud, the confidential relationship between grantor and grantees, the absence of consideration, the undue influence exercised upon the grantor by grantees, and the added factor of concealment from the grantor of the effect of her purported conveyance, permit this case to be termed a classic case of fraud in the procurement of a deed to warrant its cancellation on that ground also. Frey v. Onstott, supra; Bailey v. Smock, supra; Holliway v. Holliway, 77 Mo. 392 (1883); Cornet v. Cornet, 248 Mo. 184, 154 S.W. 121 (1912); Morriso v. Philliber, 30 Mo. 145 (1860). Accordingly, the court properly found the deed was fraudulent.

Judgment affirmed.

All concur.