Michael S. McFARLAND,
et al., Plaintiffs,

v.

WINNEBAGO SOUTH, INC.,
et al., Defendants.

No. 19967–CV–W–9.

United States District Court,
W.D. Missouri,
Western Division.

Sept. 13, 1994.

Brian Williams, Watson, Ess, Marshall & Enggas, Kansas City, MO, Thomas Ruzicka, Watson, Ess, Olathe, KS, for plaintiffs.

Thomas H. Stahl, Jennifer P. Kyner, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for defendant Truman Bank & Trust Co.

Elvin S. Douglas, Crouch, Crouch, Spangler & Douglas, Harrisonville, MO, for defendants Winnebago South, Inc., Robert V. Steinhilber, Johnita F. Steinhilber, Jack O. Hart, Bonnie Hart, The Pleasant Hill Bank, Cass County Title Co., Lake Winnebago Real Estate Sales & Mgmt. Co., Lake Winnebago South Home Owners Assn.

Fred Northcraft, Frank Brancato, Smith, Gill, Fisher & Butts, Kansas City, MO, for defendants AMCA, Ltd. and Arnold M. Cook

Associates, Inc., Arnold M. Cook, Barry Cook, Iris Cook.

Edward E. Schmitt, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, for defendant Vernon T. Wiglesworth.

Tom Rippell, Grandview, MO, for Bannister Bank.

Robert L. Jackson Jr., Kansas City, MO, for the Estate of Robert L. Jackson Sr.

Don Jackson, John Lilla, Kansas City, MO, for defendants Halsey Rains, Shirley Williams, Orien Fehrman.

*ORDER DISALLOWING CLAIMS OF DEFENDANT JOHNITA F. STEINHILBER AND DEFENDANT ROBERT V. STEINHILBER AND CANCELLING NOTE DATED FEBRUARY 6, 1969, AND SECOND DEED OF TRUST DATED JANUARY 28, 1970*

BARTLETT, District Judge.

Defendant Johnita F. Steinhilber and her husband, defendant Robert V. Steinhilber, have potential claims against the receivership in the amount of $820,000, plus interest, less payments received, based on a Promissory Note from Winnebago South, Inc. to Johnita Steinhilber dated February 6, 1969, and a Deed of Trust from Winnebago South, Inc. dated January 28, 1970. On February 20, 1992, plaintiffs filed a "Memorandum" in which they requested that the claims under the note and Deed of Trust be disallowed and the instruments cancelled based on plaintiffs' assertion that the instruments are not supported by adequate consideration. The receiver joined in the request. Accordingly, on June 8, 1992, an Order to Show Cause was issued requiring the Steinhilbers to explain why their claims should not be disallowed and the note and Deed of Trust should not be cancelled for the reasons advanced by plaintiffs. The Steinhilbers responded on June 26, 1992.

Week-long evidentiary hearings were held in March and July 1994. Based on the evidence presented at these hearings and on the stipulations of fact entered into between plaintiffs and defendants Robert V. Steinhilber and Johnita F. Steinhilber, I make the following findings of fact.

### I. *Findings of Fact*

#### A. *Claimants Robert and Johnita Steinhilber*

Robert and Johnita Steinhilber are and were at all relevant times husband and wife. Both are well educated. Robert Steinhilber received his law degree from the University of Missouri–Kansas City in 1958 or 1959 and was admitted to the Missouri Bar shortly thereafter. He is currently licensed to practice law in Missouri. Johnita Steinhilber received a B.A. from Louisiana State University, a masters degree in government from Yale University in 1946 and a J.D. from Nova University in 1980 and is licensed to practice law in Florida.

#### B. *Purchase of the Williams Farm by Robert V. Steinhilber and Johnita F. Steinhilber on December 28, 1967*

In late 1967, Robert Steinhilber was chairman of the board of directors and president of Lake Winnebago Development Company, Inc. (Winnebago North), the development arm for the Lake Winnebago North subdivision. He remained in that position through 1969. Johnita Steinhilber, Jack Hart, Bonnie Hart, Alex Flemington (Johnita Steinhilber's brother), Grace Flemington and W.J. Madden were directors of Winnebago North throughout this period. Georgina Steinhilber (Robert Steinhilber's mother), was a director in 1967. Jack Hart and Alex Flemington were also officers in Winnebago North.

Either in late October 1967 or early November 1967, Winnebago North, authorized Joseph McCambridge, one of its salesmen, to cooperate with realtor Merle Decker in attempting to procure a buyer for the Williams Farm which was owned by the Williams family.

Because the Williams Farm was located immediately south of the Lake Winnebago North subdivision, Robert Steinhilber believed it was very important to Winnebago North for the Williams Farm to be acquired by Winnebago North or by a party friendly to Winnebago North.

On December 28, 1967, Robert Steinhilber executed a real estate sales contract with the Williams family to purchase the Williams Farm for $123,000. Robert Steinhilber claims that he subsequently offered Winnebago North the opportunity to purchase the Williams Farm, but that the corporation was unable to do so. The minutes of the annual meeting of shareholders and the annual meeting of the board of directors of Winnebago North dated February 27, 1968, do not reflect that the opportunity to purchase the Williams Farm was rejected by Winnebago North or even discussed at these meetings. Nor do the minutes of a special meeting of the board of directors of Winnebago North on January 2, 1968, show that purchase of the Williams Farm was discussed.

On January 16, 1968, Robert Steinhilber, as president of Winnebago North, wrote a check drawn on the account of Winnebago North payable to Merle Decker, a realtor involved in the sale of the Williams Farm, in the amount of $1,000 for part of the down payment for the purchase of the Williams Farm. On February 12, 1968, Robert Steinhilber endorsed over to Hight and Associates a check drawn on the account of Winnebago North in the amount of $8,000 payable to R.V. Steinhilber, signed by Robert Steinhilber, as president of Winnebago North. Hight and Associates was the closing agent for the Williams Farm sale.

Merle Decker and Joseph McCambridge each received a $3,690 Promissory Note in payment for their services in connection with the sale of the Williams Farm to Robert Steinhilber. The Promissory Notes were from Winnebago North, signed by Robert Steinhilber as president and were secured by lots in the Lake Winnebago North project. Demonstrating the failure of Robert Steinhilber to separate his personal interests from those of Winnebago North was a letter dated February 9, 1968, from Robert Steinhilber, attorney at law, to Merle Decker, realtor, in which he states that "I will execute a note to you for the amount of your half of the commission and execute a note to Joe McCambridge for his half of the commission . . . ." As stated above, the word "I" turns out to be Winnebago North and not Robert Steinhilber, personally.

Pursuant to the real estate contract signed by Robert Steinhilber, a $16,000 down payment was required for the purchase of the Williams Farm. As set forth above, this down payment was paid by the January 16, 1968, check for $1,000 from Winnebago North, the February 12, 1968, check for $8,000 from Winnebago North to Robert Steinhilber and the two Winnebago North Promissory Notes totaling $7,380, less $380 returned by Merle Decker to Robert Steinhilber. Johnita Steinhilber did not contribute any money to the down payment.

After subtracting the $16,000 down payment from the $123,000 purchase price, $107,000 remained to be paid pursuant to the December 28, 1968, real estate contract. To finance the remaining $107,000, Robert Steinhilber and Johnita Steinhilber signed a Promissory Note to the Williams family in the amount of $57,000 and borrowed $50,000 from Businessmen's Assurance Company (BMA), executing a First Mortgage Real Estate Note and Deed of Trust.

Despite the fact that the real estate contract showed the purchaser of the Williams Farm to be Robert Steinhilber, a Missouri warranty deed dated February 14, 1968, was recorded on February 21, 1968, showing the purchaser to be only Johnita F. Steinhilber.

On February 5, 1968, a Certificate of Incorporation for Winnebago South, Inc. (Winnebago South) was issued by the Missouri Secretary of State. The Articles of Incorporation were signed by Robert V. Steinhilber on February 1, 1968. At all times prior to May 25, 1969, Robert Steinhilber was the president, chairman of the board of directors, chief executive officer and only shareholder of Winnebago South. Winnebago South was created to develop the Williams Farm.

### C. *Payments During 1968 On the Williams Farm Purchase*

On March 29, 1968, Robert Steinhilber paid the first quarterly interest payment on the Promissory Note to the Williams family by a check in the amount of $431.02 drawn on the account of Winnebago North. The

check stub states "Charged to R.V. Steinhilber personal account...."

Around July 1, 1968, the second quarterly interest payment on the Williams' Promissory Note was paid by a check in the amount of $855, signed by Robert Steinhilber and drawn on the account of Winnebago North.

Also around July 1, 1968, the first semiannual interest payment on the BMA Promissory Note ($1,244.44) was paid by a check signed by Robert Steinhilber and drawn on the account of Winnebago North.

The third quarter interest payment on the Williams' Promissory Note was paid by a check dated around October 1, 1968, in the amount of $855. Again, the check was signed by Robert Steinhilber and drawn on the account of Winnebago North.

By a check dated December 20, 1968, signed by Johnita Steinhilber and drawn on the account of Robert V. or Johnita Steinhilber, $29,355 in principal and interest was paid to the Williams family.

By a check dated December 26, 1968, signed by Robert Steinhilber and drawn on the account of Robert V. or Johnita Steinhilber, BMA was paid $3,750 in principal and interest.

The source of the money to make the December 1968 payments to the Williams family and to BMA was a December 20, 1968, check in the amount of $34,000 drawn on Winnebago North's account, signed by Robert Steinhilber, president, and payable to R.V. Steinhilber. This check was deposited into the account of Robert V. or Johnita F. Steinhilber to cover these December 1968 payments.

During the summer of 1968, Bonnie Hart loaned Robert Steinhilber $2,500 that she had borrowed from her father. In January 1969, Robert Steinhilber told her that he had used the $2,500 as one-third of the down payment on the Williams Farm. At the time Bonnie Hart understood Robert Steinhilber had purchased the Williams Farm. *See* Defendants' Exhibit 292 at 10–11.

The total amount of money which Robert and Johnita Steinhilber claim that they paid for the Williams Farm prior to February 6, 1969, was $45,490.46, excluding the $7,380 in Promissory Notes given to Merle Decker and Joseph McCambridge.

The total amount of money paid by Winnebago North for the purpose of purchasing the Williams Farm, including the $7,380 in Winnebago North Promissory Notes furnished to Merle Decker and Joseph McCambridge, was $53,765.46. When the $2,500 given to Robert Steinhilber by Bonnie Hart is added to this amount, the total amount of money from sources other than the Steinhilbers is $56,265.46. This amount exceeds the amount of money the Steinhilbers claim they paid on the Williams Farm (including the Promissory Notes to Decker and McCambridge) by $3,395.

Robert Steinhilber testified that he filed a gift tax return with his 1968 federal income tax return stating that he gave his wife, Johnita Steinhilber, $46,000 during 1968. Robert Steinhilber asserts that the $46,000 he gave to Johnita Steinhilber was used by her to make the payments in 1968 on the Williams Farm. If $46,000 was, in fact, given to Johnita Steinhilber in 1968, there is no credible basis for believing that the monies given were used by Johnita Steinhilber to make the payments on the Williams Farm. As previously discussed, monies actually paid on the Williams Farm in 1968 came from Winnebago North (with the exception of the March 29, 1968, check in the amount of $431.02 charged to Robert Steinhilber's personal account at Winnebago North) and not from Johnita Steinhilber. No bank records were presented showing monies transferred from Robert Steinhilber to Johnita Steinhilber and from Johnita Steinhilber for payments on the Williams Farm.

Robert Steinhilber claims that on December 28, 1968, when he wrote the $34,000 check to himself and on the dates when he wrote checks to others for the purchase of the Williams Farm, he was owed a substantial amount of money by Winnebago North for earned but unpaid salary. Accordingly, Robert Steinhilber claims the checks he wrote on Winnebago North's account were charged to his personal account at Winnebago North. Other than the one check for the March 29, 1968, payment of $431.02 to the

Williams family, no financial records of Winnebago North have been produced supporting this contention. Nor were any financial records produced showing that Robert Steinhilber was owed a substantial amount of money by Winnebago North for earned but unpaid salary for the period from December 28, 1967, to February 6, 1969. On the quarterly estimated financial statements as of September 30, 1968, furnished by Alex Flemington, secretary-treasurer of Winnebago North, to Grandview Bank, no obligation is shown for unpaid or accumulated salaries due officers. As of October 31, 1968, approximately 60 days before Robert Steinhilber wrote the December 28, 1968, check to himself in the amount of $34,000 drawn on the Winnebago North account, Robert Steinhilber owed Winnebago North in notes payable and accounts payable $87,534.04.

What appears to be part of the financial statements of Winnebago North as of October 31, 1971, are included in defendants' Exhibit 218. These partial financial statements show that Winnebago North owed Robert Steinhilber $109,607.50 for unpaid salary as of October 31, 1971. No evidence was presented relating the information about Robert Steinhilber's personal account as of October 31, 1971, to the 1968 financial statements. The size of the balance in Robert Steinhilber's personal account on October 31, 1971, suggests the possibility there was a balance in that account on October 31, 1968. However, as previously noted, the financial records from October 31, 1968, do not show Robert Steinhilber's personal account, but do show accounts where Robert Steinhilber owed Winnebago North $87,534.04.

If Robert Steinhilber, in fact, did have a personal account with Winnebago North in 1968, as he contends, the absence of financial records showing the debiting of the Winnebago North checks to Robert Steinhilber's personal account is another example of the failure to clearly separate Robert Steinhilber's personal affairs from the affairs of the corporation. If, as I conclude from the evidence presented, Robert Steinhilber had no personal account at Winnebago North with a substantial credit balance in 1968, then Winnebago North's funds, not Robert Steinhilber or Johnita Steinhilber's funds, were used to make the payments on the Williams Farm in 1968 (with the exception of the March 29, 1968, check for $431.02). Even if Robert Steinhilber had a personal account at Winnebago North with a substantial credit balance in 1968, there is no credible evidence that the checks drawn by Robert Steinhilber on the Winnebago North account were charged to Robert Steinhilber personally, with the exception of the March 29, 1968, payment.

Defendants have had access to the records of Winnebago North and Winnebago South for many years. I am confident that if other Winnebago North financial records showed salary accounts with substantial balances in favor of Robert Steinhilber, the records would have been offered in evidence. Also, if documents existed showing that the checks written by Robert Steinhilber on Winnebago North's account were debited against Robert Steinhilber's personal account, I am sure the documents would have been presented by Robert Steinhilber. None were presented.

D. *Improvements to the Williams Farm Prior to February 6, 1969*

As of December 31, 1968, $52,793.21 had been expended by Winnebago South for improvements on the Williams Farm as shown by a Statement of Condition of Winnebago South dated December 31, 1968. Of that total amount, $35,186.01 was listed on the Winnebago South Statement of Condition as an intercompany account payable to Jack Hart Construction Company. By letter dated October 4, 1968, from Alex Flemington to the Grandview Bank, Flemington states that "[o]f the $256,443.10 advanced to affiliated companies, ... $27,132 has been advanced for the engineering, survey and preliminary construction work on Winnebago South property."

In Stipulation 81, the parties agree that approximately $132,000 was expended on the Williams Farm for grading of roads, for graveling approximately two miles of road, for the construction of a small earthen retaining wall and for the installation of a roadside sign and sentry box. These services were all performed by Jack O. Hart Construction Company. In Stipulation 81, the parties do not state when the services

were performed or when the expenditures were made. Without knowing whether the improvements were made prior to February 6, 1969, this stipulation is not very helpful. Furthermore, no credible evidence has been presented showing that Johnita Steinhilber or Robert Steinhilber reimbursed Winnebago South for these expenditures or paid Jack O. Hart Construction Company for the work done with personal funds.

On January 17, 1968, Johnita Steinhilber sold her interest in some real estate in Kansas City. Robert Steinhilber testified that she did so in order to raise money for improvements to the Williams Farm. No credible evidence was presented that Johnita Steinhilber actually used the money to pay for improvements to the Williams Farm. (There were many inconsistencies between the testimony of the Steinhilbers and evidence which I find credible. Also, the evidence demonstrated a disturbing casualness in separating the personal affairs of the Steinhilbers from the affairs of Winnebago North and Winnebago South. Therefore, I am reluctant to rely on the oral testimony of either Robert Steinhilber or Johnita Steinhilber unless supported by either a stipulation of the parties or a financial or other reliable record prepared contemporaneously with the events testified about.)

Johnita Steinhilber claims that she borrowed $15,000 from Grandview Bank on September 13, 1968. Robert and Johnita Steinhilber testified that $10,000 was paid to Winnebago North for work it had performed at Winnebago South and the balance was paid for promotional expenses for Winnebago South prior to February 6, 1969. In Defendants' Exhibit 52 is a Grandview Bank deposit ticket showing that the proceeds of a $15,000 loan were deposited in Robert and Johnita Steinhilber's account on September 13, 1968. In the same exhibit is a copy of a check signed by Robert Steinhilber dated September 13, 1968, payable to Lake Winnebago Development Company, Inc. for $10,000. However, no Winnebago North records were presented substantiating the use to which Winnebago North put the $10,000 or what was done with the $4,810 balance of the $15,000 loan.

Johnita Steinhilber claims that she improved the Williams Farm by persuading the Village of Lake Winnebago to extend water and sewer services to Winnebago South. However, the ordinance authorizing the extension of water and sewer services to the northern boundary of the Williams Farm was not approved by the trustees of the Village of Lake Winnebago until February 6, 1969, the date the title to the Williams Farm was transferred from Johnita Steinhilber to Winnebago South. Even if the ordinance resulted from the efforts of Johnita Steinhilber prior to February 6, 1969, the ordinance authorizing extension of water and sewer service did not appreciably increase the value of the Williams Farm.

Johnita Steinhilber claims that she obtained the surveying, platting and staking of the Williams Farm for a lake development and that she obtained easements, rights-of-way and zoning approval. (The plat maps for blocks B, C, D and E of the Williams Farm were not filed with the Planning and Zoning Commission of the Village of Lake Winnebago until after February 6, 1969.) Johnita Steinhilber also claims that during 1968, timber was cleared from the lake bed and lots, culverts and storm sewers were put in and roads were graded and graveled. Any of this work that was done before February 6, 1969, was performed by Jack Hart Construction Company. Jack Hart Construction Company was paid by Winnebago South (not by Robert or Johnita Steinhilber) for these services *after* the property was transferred to Winnebago South on February 6, 1969. The checks paying Jack Hart Construction Company a total of $31,266.95 were dated February 12, 1969, and March 11, 1969, were drawn on the account of Winnebago South and were signed by Robert Steinhilber as president. Even if some of the work was paid for by the Steinhilbers, the work added little value to the Williams Farm because at the time the Williams Farm was transferred to Winnebago South on February 6, 1969, the project was a failure. As the receiver credibly testified, expenditures of money for development only add value if there is demand for the project. As of February 6, 1969, the demand for the project was so small that

even the Steinhilbers agreed the project was a failure.

Johnita Steinhilber also claims that she was responsible for the annexation of Winnebago South into the Village of Lake Winnebago. Robert and Johnita Steinhilber signed the application for annexation representing that they were the owners of the Williams Farm. The Williams Farm was owned by the Village of Lake Winnebago on February 6, 1969, the day ownership of the Williams Farm was transferred to Winnebago South. Annexation did not appreciably increase the value of the Williams Farm because city taxes and assessments could be levied against the land for the purpose of paying for improvements or services to Winnebago North.

Winnebago North and Winnebago South, not Johnita Steinhilber or Robert Steinhilber, supplied the funds for or were obligated to pay for most of the work done on the Williams Farm prior to February 6, 1969. Whatever time and money Johnita Steinhilber expended in implementing her retirement village concept before February 6, 1969, added little value to the Williams Farm.

### E. *The Unsuccessful Effort to Sell Lots at Lake Winnebago South before February 6, 1969*

During the summer and fall of 1968, agents of Lake Winnebago Real Estate and Management Company, the sales arm of Winnebago North, began attempting to sell lots at the Lake Winnebago South project. As of early December 1968, only seven lots had been sold. All proceeds from the sale of the seven lots were deposited into the account of Winnebago South. Out of these proceeds, Winnebago South paid sales commissions.

In December 1968 after the grand opening of the Lake Winnebago South project, Johnita Steinhilber concluded that "the project as then constituted was going to fail." Shortly thereafter, Robert and Johnita Steinhilber decided to transfer title to the Williams Farm to Winnebago South.

### F. *Transfer of the Williams Farm to Winnebago South, Inc. on February 6, 1969*

In a letter dated January 10, 1969, from Robert Steinhilber, attorney at law, to the Grandview Bank, as part of the negotiations for Grandview Bank to finance the sale of the Williams Farm to Winnebago South, Robert Steinhilber represented that the Williams Farm "was purchased for $205,000, which is $500 per acre...." (As stated previously, the purchase price of the farm was actually $123,000 or $300 per acre.) Later in the letter, Robert Steinhilber told the Grandview Bank that the Williams Farm had been purchased "by myself and my wife and Jack Hart and his wife...." (The records show that Robert Steinhilber signed the contract to purchase the farm and put the deed in Johnita Steinhilber's name. The money came from Winnebago North and from loans from the sellers and BMA.) Robert Steinhilber also told the Grandview Bank that "the purchasers have now entered into an agreement to sell the 410 acres, at a capital gain profit, to Winnebago South, a Missouri corporation made up of a group of persons who have been the key persons in the development of the original Lake Winnebago Development for the sum of $2,000 per acre ($820,000 total)...." (At the time Robert Steinhilber was the sole shareholder in Winnebago South.) Robert Steinhilber, writing on behalf of himself as attorney at law, concludes the letter with "We desire a loan of $125,000...." (Why Robert Steinhilber refers to "we" when Winnebago South was going to borrow the money is puzzling. It appears to be another example of his casualness in separating his personal interests from the interests of a corporation.)

On February 6, 1969, Robert and Johnita Steinhilber executed a warranty deed conveying the Williams Farm to Winnebago South. Winnebago South executed a Promissory Note in the amount of $820,000 to Johnita Steinhilber dated February 6, 1969, secured by a Deed of Trust dated February 6, 1969. (On January 28, 1970, Winnebago South issued as Second Deed of Trust in favor of Johnita Steinhilber in substitution for the original Deed of Trust.) Johnita Steinhilber gave a one-third interest in the Promissory Note to Bonnie Hart. Johnita Steinhilber testified that the one-third interest was to compensate Bonnie Hart for ad-

vancing one-third of the down payment for the farm. However, the records show that Bonnie Hart only gave Robert Steinhilber $2,500, which was not one-third of the $16,000 down payment.

Winnebago South borrowed $120,000 from the Grandview Bank after it acquired title to the Williams Farm. Part of the collateral supporting this loan were personal guaranties from Jack and Bonnie Hart, Robert and Johnita Steinhilber, and Winnebago North (signed by Robert Steinhilber, as president). The $120,000 loan from Grandview Bank was used by Winnebago South to pay off the approximately $76,500 balance of the notes from Robert and Johnita Steinhilber to the Williams family and to BMA. *See* Plaintiffs' Exhibits 27 and 46, and Stipulation 126.

In addition, from the proceeds of the $120,000 loan, Winnebago South paid the following amounts for work done on the Williams Farm while title was in the names of Robert and Johnita Steinhilber:

1) Jack Hart Construction Company, $31,266.95, by Winnebago South checks dated February 12, and March 11, 1969;

2) Hardwick Construction Company, $3,000, by Winnebago South check dated February 13, 1969;

3) Hydro–Conduit, $3,000, by Winnebago South check dated February 13, 1969;

4) Intercity Excavating Company, $900, by Winnebago South check dated February 13, 1969;

5) Maynes Explosives, $400, by Winnebago South check dated February 13, 1969;

6) Hardwick Construction Company, $1,168.50, by Winnebago South check dated March 25, 1969.

Each of these checks was drawn on the account of Winnebago South and signed by Robert V. Steinhilber, president of Winnebago South.

Robert Steinhilber and Alex Flemington each owned 25.5% of the common stock of Jack Hart Construction Company and Jack Hart owned the remaining 49.5%. Johnita Steinhilber never asked for or received any bills or requests for reimbursements from either Winnebago North, Jack Hart Construction Company or Winnebago South for the money any of these corporations advanced or paid for work done to the Williams Farm prior to February 6, 1969.

Therefore, the total consideration paid by Winnebago South for the Williams Farm was $949,293.21 (the sum of the $820,000 Promissory Note plus the $76,500 paid on the Steinhilbers' obligation to the Williams family and BMA plus $52,793.21 for work done on the Williams Farm before February 6, 1969).

Prior to February 6, 1969, neither Robert or Johnita Steinhilber nor Winnebago South obtained an independent appraisal of the value of the Williams Farm. The sole basis for determining the amount of the Promissory Note that Winnebago South would give to Johnita Steinhilber as part of the consideration for the Williams Farm was the opinion of Robert Steinhilber and Jack Hart. Even though Johnita Steinhilber's $820,000 was secured by a Deed of Trust on the Williams Farm, Johnita Steinhilber did not obtain any title insurance on the property.

G. *Events After February 6, 1969*

After February 6, 1969, Johnita Steinhilber received $103,175 from Winnebago South in the form of fees for releasing lots from the Deed of Trust securing the $820,000 Promissory Note. In addition, Bonnie Hart has received $51,587 from Winnebago South for mortgage release fees.

On October 24, 1972, this court appointed a Receiver for Winnebago South. As of the date of establishment of the receivership, Winnebago South had assets (exclusive of equity in the Williams Farm) of approximately $3,000 plus interest in reserves and/or escrow accounts of no more than $18,000.

As of July 18, 1994, the Williams Farm is completely undeveloped.

The transfer of the Williams Farm to Winnebago South was not an arms length transaction between Winnebago South and the record owners of the Williams Farm, i.e., the Steinhilbers. The manner in which the property was paid for, the manner in which the development work in 1968 was financed and the manner in which the Williams Farm was valued at the time of the transfer to Winne-

bago South establish that the Promissory Note and Deed of Trust given by Winnebago South to Johnita Steinhilber were given for grossly inadequate consideration.

## II. *Conclusions of Law*

■ A federal district court presiding over an equity receivership has extremely broad power to supervise the receivership and protect receivership assets. 7 *Moore's Federal Practice,* ¶ 66.08[4], (citing *Bien v. Robinson,* 208 U.S. 423, 28 S.Ct. 379, 52 L.Ed. 556 (1908); *SEC v. Hardy,* 803 F.2d 1034, 1040 (9th Cir.1986); *SEC v. Wencke,* 783 F.2d 829 (9th Cir.1986); *SEC v. Universal Financial,* 760 F.2d 1034 (9th Cir.1985); and *United States v. Arizona Fuels Corp.,* 739 F.2d 455, 459 (9th Cir.1984)). Specifically, the receivership court has the power to use summary procedures in allowing, disallowing, and subordinating claims of creditors, so long as creditors have fair notice and a reasonable opportunity to respond. *SEC v. Hardy,* 803 F.2d 1034, 1040 (9th Cir.1986); *United States v. Arizona Fuels Corp.,* 739 F.2d 455, 458 (9th Cir.1984).

■ Because a receivership court sits in equity, it also has the authority to cancel instruments and contracts, including notes and deeds of trust, as part of its equitable powers. *See Cleary v. Cleary,* 273 S.W.2d 340, 345 (Mo.1954); *Butler County, Missouri v. Campbell,* 353 Mo. 413, 182 S.W.2d 589, 592 (1944); *Signature Pool v. City of Manchester,* 743 S.W.2d 538, 541 (Mo.Ct.App. 1987); 13 Am.Jur.2d, *Cancellation of Instruments* § 5. A jury trial is not available when a party seeks the cancellation of an instrument. *United States v. Arizona Fuels Corp.,* 739 F.2d 455, 459 (9th Cir.1984); *Spaunhorst v. Spaunhorst,* 650 S.W.2d 650, 654 (Mo.Ct. App.1983); 13 Am.Jur.2d, *Cancellation of Instruments* § 62.

■ In order to justify cancellation of a Promissory Note and Deed of Trust, the evidence supporting cancellation must be clear, cogent and convincing. *Radford v. Radford,* 388 S.W.2d 33, 38 (Mo.1965); *Signature Pool v. City of Manchester,* 743 S.W.2d 538, 541 (Mo.Ct.App.1987); *Estate of Helmich v. O'Toole,* 731 S.W.2d 474, 477–78 (Mo.Ct.App.1987); *Wingate v. Griffin,* 610

S.W.2d 417, 419 (Mo.Ct.App.1980). The burden of proof is on the party who seeks the cancellation. *Wilkie v. Elmore,* 395 S.W.2d 168, 172 (Mo.1965).

■ Grounds for cancellation include fraud, misrepresentation, incompetency, duress, mistake and undue influence. *See Zelch v. Ahlemeyer,* 592 S.W.2d 482, 486 (Mo.Ct.App.1980); *see generally* 13 Am. Jur.2d, *Cancellation of Instruments* § 13–36. Inadequacy of consideration is not, by itself, sufficient to warrant equitable cancellation in the absence of some additional circumstance creating an independent ground for granting cancellation, such as fraud. *Zelch v. Ahlemeyer,* 592 S.W.2d 482, 486 (Mo.Ct.App. 1980); *Drake v. Greener,* 523 S.W.2d 601, 606 (Mo.Ct.App.1975). However, when inadequate consideration is combined with a fiduciary relationship "and [there is] even the slightest circumstance of fraud, duress, mistake or undue influence, equity will step in to prevent injustice." *Zelch v. Ahlemeyer,* 592 S.W.2d 482, 486 (Mo.Ct.App.1980); *see Drake v. Greener,* 523 S.W.2d 601, 606 (Mo.Ct.App. 1975). Furthermore, "[i]n many ... cases a shocking inadequacy of price or of consideration, without more, is held to be evidence of fraud, and courts of equity grant relief, not on the ground of inadequacy of consideration, but on the ground of fraud shown by the shocking inadequacy of consideration." *Frey v. Onstott,* 357 Mo. 721, 210 S.W.2d 87, 93 (1948); *see Bolten v. Colburn,* 389 S.W.2d 384, 390 (Mo.Ct.App.1965) ("While inadequacy of consideration in the conveyance of property ... [is] a badge of fraud, ... it is not generally regarded as sufficient alone to raise a legal inference of fraud unless so gross as to create the assumption the conveyance could not have been made in good faith."); 37 Am.Jur.2d, *Fraud and Deceit* § 475.

Other "[r]ecognized indicia or badges of fraud include fictitious consideration, false statements as to consideration, transfers different from the usual method of doing business, transfer of all a debtor's property, insolvency, confidential relationship of the parties and transfers in anticipation of suit or execution." *Conrad v. Diehl,* 344 Mo. 811, 129 S.W.2d 870, 877 (1939). While "[n]one of

these things alone prove fraud, ... they do warrant an inference of fraud, especially where there is a concurrence of so many of these badges." *Id.*

■ Also of relevance to this dispute is the law governing the relationship between a corporation and its officers and directors.

It is the uniform rule that a director or officer of a corporation occupies [a] fiduciary relation to the corporation and its shareholders. Since he occupies this relation he may not profit personally by virtue thereof at the expense of the corporation or the stockholders.... The relation alone of a director or officer of a corporation does not prevent the director or officer from doing business with the corporation at a profit.... The prohibition encompassed in the above general rules is directed at unconscionable and secret profits.

*Scott v. Potter Plumbing & Heating Inc.*, 596 S.W.2d 492, 494 (Mo.Ct.App.1980) (quoting *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425, 431–32 (Mo.1968)).

■ Accordingly, it is not inherently improper for a corporation to purchase property from its directors or officers. *Scott v. Potter Plumbing & Heating Inc.*, 596 S.W.2d 492, 494 (Mo.Ct.App.1980). However, the burden is on the director or officer to prove that "they had gained no unconscionable or secret profits as a result and that they had dealt with the corporation fairly, honestly and in good faith." *Jackson v. St. Regis Apartments, Inc.*, 565 S.W.2d 178, 182 (Mo. Ct.App.1978); *see Simpson v. Spellman*, 522 S.W.2d 615 (Mo.Ct.App.1975). Before the burden shifts to the officer or director, however, the complaining party must prove the existence of a transaction between the corporation and the director or officer. *Jackson v. St. Regis Apartments, Inc.*, 565 S.W.2d 178, 182 (Mo.Ct.App.1978).

The Promissory Note and Deed of Trust from Winnebago South to Johnita Steinhilber dated February 6, 1969, and the Deed of Trust dated January 27, 1970, were given by Winnebago South for grossly inadequate consideration. The grossly inadequate consideration plus the circumstances surrounding the purchase of the Williams Farm, the manner in which the work done on the Williams Farm during 1968 was paid for and the circumstances surrounding the transfer of the Williams Farm to Winnebago South on February 6, 1969, establish a breach of fiduciary duty by Robert Steinhilber to Winnebago South and sufficient badges of fraud by both Robert Steinhilber and Johnita Steinhilber to justify equity stepping in to prevent an injustice to Winnebago South. Injustice to Winnebago South can only be prevented by cancelling the Promissory Note dated February 6, 1969, and the Deed of Trust dated January 27, 1970.

### III. *Discussion*

■ The evidence has established that Johnita Steinhilber and Robert Steinhilber did not pay any of their own money for the purchase of the Williams Farm, with the exception of a $431.02 payment charged to Robert Steinhilber's personal account at Winnebago North and the $2,500 borrowed from Bonnie Hart. Instead, the Steinhilber's purchase of the Williams Farm was made with corporate funds from the accounts of Winnebago North and Winnebago South. Furthermore, Johnita Steinhilber and Robert Steinhilber did not use any of their own money to pay for work done on the Williams Farm during 1968. The work done was either paid for by Winnebago North and Winnebago South, or was charged to these corporations. Winnebago North and Winnebago South were not reimbursed for these expenditures by the Steinhilbers.

The work done on the Williams Farm prior to February 6, 1969, did not substantially increase the value of the property. Accordingly, at the time of the transfer of the Williams Farm from the Steinhilbers to Winnebago South, the property was worth approximately $123,000, the purchase price of the property one year earlier. Of the funds expended to purchase the property, only $2,931.02 can be attributed to the Steinhilbers' personal funds, while $53,334.44 came from Winnebago North and $76,500 came from Winnebago South. Nevertheless, Winnebago South purchased the Williams Farm from Johnita Steinhilber for $949,293.21, consisting of the $820,000 note to Johnita Stein-

**1036**

hilber, the $76,500 to pay off Johnita and Robert Steinhilbers' notes to BMA and the Williams family and $52,793.21 for work done on the Williams Farm before February 6, 1969. The amount paid by Winnebago South for the Williams Farm was so much in excess of what the property was worth at the time as to shock the conscience of any reasonable person. This conclusion is based on clear, cogent and convincing evidence.

▆ In view of these facts, plus the fact that Johnita and Robert Steinhilber invested virtually none of their own funds in the Williams Farm, plus the fact that the efforts to sell lots in the Winnebago South project had been a failure, the issuance of the Promissory Note and Deed of Trust to Johnita Steinhilber for $820,000 amounted to a gift of Winnebago South assets to the wife of the sole shareholder of Winnebago South in a transaction orchestrated by the sole shareholder, Robert Steinhilber. Self-dealing of this type at the expense of the corporation is a badge of fraud.

▆ Even if I were to accept the position advocated by the Steinhilbers (which I do not) that all funds paid by Robert Steinhilber out of the Winnebago North account were charged to Robert Steinhilber personally, the conclusion would be the same. Under this incredible hypothetical, Robert and Johnita Steinhilber would have paid a total of $52,490.46 in principal ($47,005.56) and interest ($5,484.90) for the Williams Farm. (Compare this total with defendants' Proposed Finding of Fact No. 39, which states that the Steinhilbers paid a total of $52,793.46 for the Williams Farm.) At the most, $37,132 was paid by the Steinhilbers for work done on the farm prior to its sale to Winnebago South ($27,132 advanced by Winnebago North to Winnebago South plus $10,000 paid by the check from Robert Steinhilber to Winnebago North dated September 13, 1968). For a total investment of $89,622.46 the Steinhilbers received an $820,000 Promissory Note plus $76,500 paying off obligations to the Williams family and BMA. In light of the fact that the development project was a failure and that the improvements had not enhanced the value of the Williams Farm, the consideration given by the Steinhilbers in exchange for the $820,000 Promissory Note and Deed of Trust was so grossly inadequate as to constitute a badge of fraud. (Under the more credible version of events, Johnita Steinhilber had none of her money invested in the Williams Farm yet she received the $820,000 Promissory Note from Winnebago South which makes the inadequacy of the consideration even more dramatic.)

▆ Not only was the consideration so grossly inadequate as to constitute a badge of fraud, but it has also been established by clear, cogent and convincing evidence that the sale of the Williams Farm to Winnebago South was tainted with self-dealing in violation of Robert Steinhilber's fiduciary duty to Winnebago South. The sale of the Williams Farm by the Steinhilbers to Winnebago South was not an arms-length transaction. At the time of the transfer Robert Steinhilber was President, Chairman of the Board, and sole shareholder of Winnebago South. Johnita Steinhilber was the wife of Robert Steinhilber. Despite the fact that the Williams Farm development was a failure and despite the fact that the wife of the President and Chairman of the Board of Winnebago South was receiving an $820,000 Promissory Note from Winnebago South when she had invested none of her money in the Williams Farm, no independent appraisal of the fair market value of the Williams Farm was obtained. Instead, the sale price of the Williams Farm was based solely upon the opinions of Robert Steinhilber and Jack Hart. Both of these individuals had an interest in inflating the purchase price. Robert Steinhilber's wife was the seller of the property, while Jack Hart's wife received a one-third interest in Johnita Steinhilber's Promissory Note.

The history of the Steinhilbers' dealings with Winnebago North and Winnebago South in the late 1960's shows that little attention was paid to separating the personal interests of the Steinhilbers from the interests of the corporations. Thus, it is not surprising that Robert Steinhilber structured the transfer of the Williams Farm so that his wife benefitted from money expended by Winnebago North and Winnebago South without fair consideration flowing to Winnebago South.

In circumstances such as this, a court of equity will step in to prevent injustice. Johnita Steinhilber has already received $103,175 in payments from Winnebago South for the Williams Farm. It would be a gross injustice for Winnebago South to pay her another penny.

### IV. *Conclusion*

For the reasons stated, it is ORDERED that:

1) Johnita and Robert Steinhilber's claims against the receivership in the amount of $820,000, plus interest, less payments received, based on a Promissory Note from Winnebago South, Inc. to Johnita Steinhilber dated February 6, 1969, and a Deed of Trust from Winnebago South, Inc. dated January 28, 1970, are disallowed; and

2) the Promissory Note from Winnebago South, Inc. to Johnita Steinhilber dated February 6, 1969, in the amount of $820,000 and the Deed of Trust from Winnebago South, Inc. to Johnita Steinhilber dated January 28, 1970, are declared null and void and are cancelled as obligations of Winnebago South, Inc.